UNITED STATES of America,
Plaintiff-Appellee,

v.

William Frederick GEITTMANN, Jr. and
David Robert Zamansky,
Defendants-Appellants.

Nos. 83–2064, 83–2066.

United States Court of Appeals,
Tenth Circuit.

May 25, 1984.

Rehearing and Rehearing In Banc
Denied May 25, 1984.

James F. Robinson, Asst. U.S. Atty., Oklahoma City, Okl. (William S. Price, U.S. Atty., Oklahoma City, Okl., with him on brief), for plaintiff-appellee.

Gerald H. Goldstein, Goldstein, Goldstein & Hilley, San Antonio, Tex. (Ralph A. Lopez, Goldstein, Goldstein & Hilley, San Antonio, Tex., with him on brief), for defendant-appellant Zamansky.

S.A. Guiberson, Guiberson Law Offices, P.L.C., Houston, Tex. (William M. Ravkind, Dallas, Tex., with him on brief), for defendant-appellant Geittmann.

Before McWILLIAMS, BREITENSTEIN and WILLIAM E. DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

Involved herein are the appeals of David Zamansky and William Geittmann from convictions on federal drug charges. The cases have been consolidated on appeal but they must be considered separately here, because they are different, as will be seen.

### I.  APPEAL OF ZAMANSKY

Zamansky was charged in a seven count indictment with conspiracy and drug smuggling charges.  There was a plea bargain and he entered a plea of guilty to a single charge, use of the telephone to facilitate a conspiracy to smuggle marijuana into the United States.

The United States District Court for the Western District of Oklahoma sentenced defendant to two and one-half years in prison and a fine of $3,000.  The defendant has appealed on the ground that his attorney who negotiated the plea bargain and his subsequent attorney at sentencing had actual conflicts of interest that deprived defendant of due process and effective assistance of counsel.

*The Salient Facts*

The facts which have given rise to this are as follows: Zamansky was one of a group of men, including Geittmann, indicted by a federal grand jury on February 1, 1983.  He was charged with various drug-related offenses in connection with an alleged conspiracy to import, transport and distribute 1,680 pounds of marijuana.  Zamansky's original lawyers sought to withdraw from the case.  At a March 25, 1983, pre-trial hearing on this issue, Zamansky was represented by a new attorney, one William Liebel, who also represented Geittmann.  At the pre-trial hearing the district court considered Liebel's possible conflict of interest, concluded that no actual conflict existed, granted the prior attorneys' motion to withdraw, and directed that valid waivers of the right to separate representation be secured from both Zamansky and Geittmann.  On April 7, 1983, Zamansky filed his waiver of right to separate representation, stating that he had been advised of his right to effective representation by separate counsel, that any potential conflicts had been discussed, and that he waived the right to separate counsel.

On May 11, 1983, Liebel moved to withdraw from representing Geittmann, on the

ground he had an on-going attorney-client relationship with a newly-indicted co-defendant, Graham Kendall, and that Geittmann had agreed to testify against Kendall and Zamansky. On May 13, 1983, attorney Liebel's motion was granted.

Attorney Liebel continued to represent defendant Zamansky and negotiated a plea agreement with the government. Pursuant to that agreement Zamansky entered a plea of guilty to one count of use of the telephone to facilitate a conspiracy to import marijuana into the United States. He also agreed to testify against his co-defendants. The government agreed to dismiss all the other counts.

## The First Purported Conflict

Before Zamansky's sentencing Liebel moved to withdraw as counsel for Zamansky, stating that he had advised Zamansky of his on-going lawyer-client relationship with Kendall and that Zamansky had repeatedly denied any knowledge of Kendall. Zamansky, however, surprised Liebel by testifying materially against Kendall in fulfillment of his plea agreement to testify against all co-conspirators. Liebel was seeking to withdraw from the case because he had just learned of the conflict of interest. The court granted Liebel's application to withdraw. Liebel later testified on Kendall's behalf, and allegedly contradicted Zamansky's testimony. Kendall's case was tried before the judge who eventually sentenced Zamansky.

## Entry of New Counsel

Zamansky retained new counsel, William Ravkind, who filed a motion to dismiss the indictment on the ground of a conflict of interest. The court denied the motion. The new attorney, who was also Geittmann's attorney, entered the case temporarily and only to raise the conflict of interest problem and represent Zamansky at sentencing. At sentencing he did not argue Zamansky's limited culpability compared to the others, including Geittmann, although he did speak on Zamansky's behalf. Defendant was sentenced to two and one-half years in prison and fined $3,000.

## Zamansky's Contentions

Zamansky contends in this appeal that each of his attorneys labored under an actual conflict of interest in representing him, and that he was therefore deprived of his right to effective assistance of counsel under the sixth amendment and his right to a fair trial under the fifth amendment due process clause. Case law was cited for the proposition that once an actual conflict of interest exists, a criminal defendant is entitled to the reversal of his conviction as a matter of law. *See, e.g., United States v. Martinez*, 630 F.2d 361 (5th Cir.1980), *cert. denied*, 450 U.S. 922, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981); *Castillo v. Estelle*, 504 F.2d 1243 (5th Cir.1974). Because the representation of Zamansky by attorneys Liebel and Ravkind raise different legal issues, they are addressed separately.

## Liebel

In essence, Zamansky maintains that because Liebel had an "on-going and continual lawyer-client relationship" with Kendall, he therefore had an actual conflict of interest. According to Zamansky this resulted in Liebel's alleged delay in entering plea negotiations and in his alleged failure to negotiate a more advantageous plea bargain for Zamansky. Zamansky argues that Liebel's subsequent testimony on Kendall's behalf demonstrated the conflict.

We must conclude that Zamansky's position is lacking in merit. A real question exists whether Zamansky has raised this issue sufficiently to warrant inquiry into his guilty plea. *See Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973). In *Tollett*, the Supreme Court held that

A guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He can only attack the voluntary and intelligent char-

acter of the guilty plea by showing that the advice he received from counsel was not within the standards set by *McMann* [*v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)].

It is to be noted that Zamansky in this appeal has not charged that the advice he received from Liebel was incompetent. Moreover he does not explicitly deny that his plea was voluntarily or intelligently made. At sentencing, when attorney Ravkind raised the question of attorney Liebel's conflict of interest, he specifically stated that Zamansky did not seek to withdraw his plea. Zamansky has merely asserted on appeal that his plea bargain was less advantageous than it might have been. This contention does not necessarily constitute an argument that counsel's advice was incompetent, as required by *Tollett, supra.* This court will give Zamansky the benefit of the doubt, however, and treat his argument as a claim that his plea was not voluntary and intelligent because of counsel's alleged conflict.

### Discussion of Attorney Conflict

■ In examining Zamansky's substantive allegations of attorney conflict, however, his claim has no merit. There is no evidence that Liebel had any conflict until after Zamansky had entered his plea. Liebel's application to withdraw from representing Zamansky alleged that when asked by counsel, Zamansky "beyond doubt denied any knowledge of defendant Kendall's participation in the alleged criminal activity, and further stated that he had never even heard Kendall's name before being mentioned by counsel." It was only after Zamansky had entered a plea of guilty that he testified materially against Kendall, alerting Liebel to the conflict. Upon learning of this, Liebel immediately sought to withdraw from the case. Zamansky never, prior to his pleading guilty, informed Liebel that he knew Kendall or could testify materially against him. Because Liebel could not have known of any latent conflict, no conflict of interest could have affected his representation of Zamansky during plea negotiations. The defendant has thus failed to demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). The fact that Liebel, after withdrawing from Zamansky's defense, testified on Kendall's behalf, cannot affect the validity of Zamansky's plea. *See Dukes v. Warden*, 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 817 (1972).

We must conclude that Zamansky's claim has to be rejected insofar as it alleges that Liebel's alleged conflict should result in reversal of Zamansky's conviction on his guilty plea. Zamansky utterly failed to establish that his guilty plea was unintelligently or involuntarily made, because he was unable to show that an actual conflict existed or that it affected his plea. Therefore, the conviction must be upheld.

### Zamansky's Contention that Attorney Ravkind had a Conflict

A final contention made by Zamansky is that his second attorney, Ravkind, was also encumbered by a conflict of interest, which affected his representation at sentencing. Because Ravkind represented both Zamansky and Geittmann at sentencing, it is alleged that he was unable to zealously advocate leniency on Zamansky's behalf. Reliance is placed on *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), for the proposition that counsel has a duty at sentencing to convince the court to be lenient. Zamansky claims that Ravkind was unable to argue Zamansky's relative innocence compared to the culpability of Geittmann. According to Zamansky, when an attorney is compelled to refrain from acting for one defendant to protect another, that attorney cannot render effective assistance of counsel to the slighted defendant. *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

The government argues that Zamansky had earlier waived his right to independent counsel when Liebel represented both Zamansky and Geittmann. The government argues that this knowing and intelligent waiver applies equally to Ravkind, who labored under the same potential conflict.

Further, the government argues that no prejudice arose from this arguable conflict.

Purported waivers of fundamental constitutional rights are subject to the most stringent scrutiny. *In re Bryan,* 645 F.2d 331, 333 (5th Cir.1981). Valid waivers "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970). Because of the potentially grave consequences of the waiver of fundamental constitutional rights, courts "indulge every reasonable presumption against the loss of constitutional rights." *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970).

With these principles in mind, we cannot find a waiver of the right to separate counsel in this case. Zamansky was never instructed about the possible conflict that Ravkind might face in advocating leniency on Zamansky's behalf. We cannot infer a waiver from Zamansky's earlier consent to dual representation by Attorney Liebel. A criminal defendant may be convinced that one particular attorney can properly handle a potential conflict of interest; we cannot presume from this that the defendant would have had equal confidence in a different attorney, not contemplated when the waiver was executed. To do so would directly conflict with the presumption against waiver of fundamental constitutional rights. Under Federal Rule of Criminal Procedure 44(c), the trial judge should have advised Zamansky of his right to conflict-free counsel during sentencing. Zamansky's consent to dual representation by a different attorney, executed several months earlier, cannot cure this defect.

It appears that Ravkind labored under an actual conflict of interest during Zamansky's sentencing. Ravkind also represented Geittmann, and has continued to represent Geittmann up through this appeal. Ravkind's relationship to Geittmann may have precluded zealous representation of Zamansky's interests at sentencing. In fact, Ravkind did not argue Zamansky's relative innocence compared to Geittmann,

even though this was a strong argument in favor of leniency. Under these circumstances, we must conclude that Ravkind had an actual conflict of interest that affected his representation of Zamansky.

In our previous decision in this case, this court held that in addition to showing actual conflict that affected representation, a defendant must show prejudice to command reversal in cases of conflict of interest. In that opinion, we underestimated the force of the presumption of prejudice often applied in conflict cases. The Supreme Court has now made clear that although there is not a *per se* presumption of prejudice in conflict of interest cases, the criminal justice system maintains "a fairly rigid presumed prejudice for conflicts of interest." *Strickland v. Washington,* —— U.S. ——, ——, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984).

A case recently decided in this circuit is consistent with the Supreme Court's pronouncement in *Strickland, supra.* In *United States v. Winkle,* this court held that "if the defendant can show that his attorney's previous representation of the witness adversely affected the adequacy of defendant's representation, then defendant need not demonstrate prejudice to obtain relief." 722 F.2d 605, 610 (10th Cir.1983).

*Winkle* and *Strickland,* taken together, establish that prejudice must be presumed where a defendant shows that an actual conflict of interest adversely affected his representation. Thus, a criminal defendant need not also show prejudice to receive relief in actual conflict cases. *Winkle, supra.*

Accordingly, this court's order in the earlier opinion must be modified. Zamansky's conviction must stand because no conflict affected his guilty plea. However, because Zamansky has shown that an actual conflict adversely affected his representation at sentencing, his case must be remanded for resentencing. The prior order of this court having to do with sentencing must therefore be vacated. The cause of Zamansky must be remanded to the district court for the purpose of allowing Zamansky to

obtain different counsel and for the purpose of pronouncing sentence. It is so ordered.

## II. APPEAL OF GEITTMANN

The defendant William Geittmann was charged with and convicted of conspiracy to import a controlled substance into the United States contrary to 21 U.S.C. § 963 and 18 U.S.C. § 2. Geittmann challenges the trial court's consideration of tape recordings of certain telephone conversations which he had with a co-defendant. Geittmann argues that the recordings were obtained in violation of his fifth amendment right against self-incrimination and also his sixth amendment right to counsel.

Two groups of incriminating statements were made by Geittmann: one group was obtained prior to the arrest and indictment of Geittmann and the others were made following his arrest and indictment, when he was at liberty on bond.

*Facts*

On August 21, 1982, Patrick Callihan and Christian Carr were arrested in Easterwood, Louisiana, while they were refueling a marijuana-laden airplane. According to the government, the transport of the 1,680 pounds of marijuana was the culmination of a conspiracy between Callihan, Carr, Geittmann, Zamansky and others to smuggle the substance from South America to Cancun, Mexico, and eventually to Oklahoma. The government has alleged numerous overt acts in furtherance of the conspiracy. These included interstate travel of the defendants to plan the enterprise, transfer of money through interstate commerce, the purchase of tires and electronic equipment as "gifts" for Mexican officials, the outfitting of the aircraft with "bladders" with which to transport the marijuana, and ultimately, the acquisition and transportation of the drug into the United States.

In early October, 1982, Callihan agreed to cooperate with the government in its investigation of the smuggling operation. As a part of this agreement, Callihan made tape recordings of conversations between himself and Geittmann. The government thereby obtained recordings of dozens of conversations between Callihan and Geittmann. The government alleges that on November 9, 1982, DEA agents told Callihan to cease the recording of the conversations. However, Callihan did not stop recording conversations, and later submitted additional tapes to the government. These embraced conversations which took place in February and March of 1983, sometime after Geittmann's indictment. Geittmann also taped conversations between himself and Callihan during this period.

Geittmann was indicted in seven counts on February 1, 1983. He was arraigned on March 8th and was represented by counsel at the arraignment. On April 6, 1983 a superceding indictment was returned and on April 11th defendant was again arraigned. Pursuant to a reciprocal discovery agreement, Geittmann learned that the government had tape recordings of phone conversations between him and Callihan and that the government intended to use them at trial. There were a total of seventy-seven phone conversations which had been recorded. There were sixty-two conversations recorded before defendant was indicted; fifteen were recorded after the indictment; eleven were recorded after Geittmann's initial arraignment and after he had retained counsel. On April 24, 1983, defendant filed a motion to suppress. In it he alleged that the post-indictment recordings had been obtained in violation of his fifth and sixth amendment rights.

Before the trial court ruled on his motion to suppress, Geittmann waived a jury trial and entered into a Stipulation of Facts in Evidence. This was based on a plea bargain with the government. The government agreed to prosecute only on Count III of the indictment, the conspiracy count, in exchange for Geittmann's testimony against a co-defendant. The Stipulation of Facts recited the evidence the government would elicit from witnesses Callihan and Carr, the exhibits the government would produce, and the defendant's objections to the witnesses' credibility and the admission of the post-indictment tapes. At that time, Geittmann did not challenge the government's case but elected to remain silent.

He reserved, however, the right to appeal the evidentiary matters. The United States District Court for the Western District of Oklahoma reviewed the evidence stipulated by the parties and found the defendant guilty of the offense listed in Count III, conspiracy to import marijuana contrary to 21 U.S.C. § 963 and 18 U.S.C. § 2. Geittmann was sentenced to five years in prison and was also fined in the amount of $15,-000.

*Issue on Appeal*

There is only one issue which is presented on this appeal: whether the trial court improperly considered the post-indictment taped conversations. Geittmann contends that the government, through its agent Callihan, surreptitiously elicited inculpatory statements from Geittmann in violation of his fifth amendment right against self-incrimination and his sixth amendment right to counsel. Thus, he claims that he is entitled to an acquittal. The government argues that Geittmann waived any constitutional rights that he might have had in connection with the conversations, and that the admission of the evidence was, at best, harmless error.

*Geittmann's Contention that his Fifth Amendment Rights Were Violated After He was in Custody*

■ Geittmann maintains that the government's interrogation of him through Callihan constituted a violation of his fifth amendment rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The Supreme Court held in *Miranda* that the fifth amendment guarantees an accused the right to have counsel present during custodial interrogation. In *Miranda*, the Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. In *Miranda*, the Court emphasized the coercive nature of custodial interrogation in holding that special safeguards were required in that situation to protect an individual's fifth amendment right against self-

incrimination. Non-custodial interrogation does not generally involve the same element of police coercion, and thus generally does not require the protections required in *Miranda. See Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

Geittmann maintains that while he was out on bond, he remained "in custody" within the meaning of the *Miranda* decision and that the tapes of his conversations with Callihan were thus violative of his fifth amendment rights under *Miranda*. It is true that Geittmann had been indicted when the challenged tapes were made. However, he was free on bond. The conversations took place on the telephone and often when Geittmann was at his home in Aspen, Colorado. He was not physically confined in any significant way. *See United States v. Jackson*, 627 F.2d 1198 (D.C. Cir.1980).

*The Sixth Amendment Violation*

■ Geittmann further contends that there is a serious claim based upon the sixth amendment. He contends that the taped conversations, elicited surreptitiously by the government through Callihan, violated his sixth amendment right to counsel. *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

The sixth amendment right to counsel attaches at the "initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). It is plain that the sixth amendment guarantees a criminal defendant the right to counsel at all "critical stages" of a prosecution. *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The sixth amendment's guarantee of counsel during criminal prosecutions includes the right to counsel during post-indictment police interrogations. The Supreme Court has made clear

that once the right to counsel has attached, "the defendant's own incriminating statements [elicited surreptitiously by the police without counsel present may] not constitutionally be used by the prosecution as evidence against him at his trial." *Massiah v. United States*, 377 U.S. at 207, 84 S.Ct. at 1203; *United States v. Henry, supra.* In the context of post-indictment interrogation, the sixth amendment right to counsel is similar to the fifth amendment right against self-incrimination as set forth in *Miranda.* The sixth amendment right to counsel is broader, however, and may exclude evidence at trial not protected by the fifth amendment.

In *Massiah, supra,* the petitioner had been indicted for violating federal drug laws. He retained counsel, entered a plea of not guilty, and was released on bail. Unbeknownst to Massiah, a co-defendant had decided to cooperate with government agents in their investigation of the narcotics activities. The co-defendant permitted a government agent to install a listening device in his car, and he later engaged in a lengthy conversation with Massiah. In this conversation Massiah made several incriminating statements. An agent listened to the conversation, and at Massiah's trial the government introduced the agent's testimony regarding the incriminating content of the conversation. The Supreme Court held that the government's actions in deliberately and surreptitiously eliciting incriminating statements from an indicted defendant in the absence of counsel denied him the basic protections of the sixth amendment right to counsel.

In *United States v. Henry, supra,* the Supreme Court reaffirmed the principle of the *Massiah* case. The defendant in *Henry* had been arrested and charged with armed robbery. He was held in jail pending trial. A paid government informant was housed in the same cell block as Henry, and a government agent asked the informant to "be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the robbery." *Id.* 447 U.S. at 266, 100 S.Ct. at 2184. The informant reported to the agent the details of a conversation he had with Henry, in which Henry had told him about the alleged bank robbery. He testified at Henry's trial regarding Henry's statements. The Supreme Court held that even though the government had not specifically requested the informant to elicit information from Henry, "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." *Id.* at 274, 100 S.Ct. at 2189. Particularly, the court cited three factors that influenced its decision: *first,* the cell-mate was acting under instructions as a paid government informant; *second,* the informant was ostensibly no more than a fellow inmate who gained Henry's trust, and; *third,* Henry was in custody and under indictment at the time he engaged in the conversation with the informant. 447 U.S. at 270, 100 S.Ct. at 2186.

The facts in the present case are indistinguishable from those in *Massiah,* and are very similar to those in *Henry.* Like *Massiah,* this case involves post-indictment conversations between the defendant and a co-defendant who was secretly cooperating with the government. Here, as in *Massiah,* the trusted co-defendant obtained incriminating statements from the defendant without the presence of counsel.

The government urges that the factors regarded as important by the Supreme Court in *Henry* were absent here, and that this case thus does not present a sixth amendment argument. Particularly, the government claims that Callihan was not paid for his services, that Geittmann was not in custody, and that Geittmann knew Callihan. These responses are not adequate. The factors considered by the Supreme Court in *Henry* are not prerequisites to a finding of a sixth amendment violation. They merely are factors which, in the context of the *Henry* case, suggest the deliberate and surreptitious actions of the government in eliciting incriminating statements. In *Massiah,* the co-defendant was known to Massiah and was not paid for his services. Nor was Massiah in actual custody at the time his statements were made.

*Massiah* and *Henry* condemn deliberate efforts by the government to create situations in which indicted defendants are likely to make incriminating statements to seemingly independent others in the absence of counsel. Here we do not have a case in which independent parties come to police with unsolicited incriminating information provided by defendants. *See, e.g., United States v. Franklin,* 704 F.2d 1183 (10th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 146, 78 L.Ed.2d 137 (1983).

The government argues that its agents had asked Callihan to stop taping his conversations with Geittmann in November. The government claims that Callihan thus ceased to act as a government agent, and that the post-indictment recordings did not therefore violate Geittmann's right to counsel. This argument is not acceptable. In *Henry,* the agents instructed the informant to listen for information, but not to initiate conversations with Henry about the robbery. The informant engaged in discussions with Henry, and the Supreme Court held that these violated Henry's sixth amendment right to counsel regardless of whether the informant obeyed the government's request. In the present case, the government agents led Callihan to believe that his cooperation in the investigation would be to his advantage. He began taping the conversations at the request of the government. There is no evidence presented by the government that its agents actually asked him to stop, or that they were unaware that Callihan continued to tape the conversations. Moreover, the taping of the conversations is not critical here. The violation arises from the presentation of defendant's inculpatory statements at trial, whether by tape or by testimony. Absent a showing that the government instructed Callihan to cease eliciting statements from Geittmann, taped or not, our assumption must be that Callihan continued to act as an agent of the government. It would appear that the government deliberately created a situation in which the indicted defendant would be likely to incriminate himself in the absence of counsel. *United States v. Henry, supra.*

## The Waiver Argument

The government would have us believe that Geittmann had waived his right to counsel during the post-indictment period when the conversations were recorded. The government calls attention to the fact that Geittmann himself taped some of the challenged conversations, that he knew Callihan was cooperating with the government, that he initiated some of the conversations, and that Geittmann is well educated and is wealthy.

*Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), sets forth the Supreme Court standard by which to judge whether a criminal defendant has waived his or her constitutional right to counsel. The Court said that "[a] waiver is ordinarily an intentional relinquishment or abandonment of a known right." *Id.* at 464, 58 S.Ct. at 1023. Moreover, "courts must indulge every reasonable presumption against the loss of constitutional rights." *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970).

There has not been any persuasive argument presented to support the government's claim that Geittmann waived his right to counsel. Geittmann did not know that Callihan was acting as an agent of the government during the taped conversations. It is true that Geittmann learned at some point in the investigation that Callihan had agreed to testify against him in fulfillment of a plea agreement. The tapes, however, indicate that Callihan led Geittmann to believe that he would protect Geittmann by leaving the country or telling a different story at trial. Callihan encouraged Geittmann to trust him. In such circumstances the government will not be heard to argue that Geittmann knew he was really talking to the police. Had he known that, he could have waived his rights, but he cannot be said to have intentionally relinquished a known right under the circumstances here presented. "[T]he concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting

for the government." *United States v. Henry,* 447 U.S. at 273, 100 S.Ct. at 2188 (citing *Johnson v. Zerbst, supra.*) The fact that Geittmann was educated and wealthy surely does not change this result. Nor does the fact that Geittmann initiated some of the recorded telephone calls constitute a waiver. *See United States v. Henry,* 447 U.S. at 271–72 and n. 10, 100 S.Ct. at 2187–88 and n. 10.

■ The government poses a more difficult and initially attractive question in its claim that Geittmann's taping of certain conversations constitutes a waiver of his right to counsel. If Geittmann himself taped the conversation, he must have consented to the recording. But, the recording of the conversation has no bearing on the issue of waiver. It is the surreptitious questioning by the government that offends defendant's right to counsel. Since Geittmann did not know that Callihan was acting as a government informant during the conversations, he cannot be said to have knowingly and intelligently waived his right to counsel. Callihan would not be allowed to testify about Geittmann's inculpatory statements. There is no reason to permit the same statements to be considered by the court, merely because Geittmann recorded them.

CONCLUSION

■ It is plain that two distinct types of conversations were recorded; *first,* those made prior to arrest and indictment, and *second,* the ones that were made thereafter. Those which took place prior to the indictment are constitutionally valid evidence and were properly considered by the court. *See, e.g., Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). The conversations which were taped subsequent to Geittmann's indictment, however, were conducted in violation of Geittmann's sixth amendment right to counsel and they should have been excluded. The admission of constitutionally infirm evidence is a violation of the constitution and "requires a new trial unless we are convinced that the error is harmless beyond a reasonable doubt." *United States v. Massey,* 687 F.2d 1348 (10th Cir.

1982). *See, also, Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). It is our conclusion that this is an error which this court cannot find to be harmless error beyond a reasonable doubt. The cause must be remanded to the trial court in order for that court to order stricken the evidence that is tainted. The court is free to receive and reconsider the stipulated evidence which is not tainted.

Therefore, the judgment of the district court is reversed and the cause is remanded to the trial court for further proceedings consistent with the views expressed herein.

Before SETH, BREITENSTEIN, HOLLOWAY, McWILLIAMS, BARRETT, WILLIAM E. DOYLE, LOGAN, and SEYMOUR, Circuit Judges.

These matters come on for consideration of the petition for rehearing, with suggestion for rehearing in banc, filed by appellant David Robert Zamansky, in captioned cause No. 83–2066.

As a result of its attention being called to recent authorities, *Strickland v. Washington,* —— U.S. ——, ——, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984), and *United States v. Winkle,* 722 F.2d 605 at 610 (10th Cir.1983), the Court orders its opinion filed on April 19, 1984 withdrawn and the opinion filed this date substituted for it.

Upon consideration whereof, the petition for rehearing is denied by the panel to whom the case was argued and submitted, and no member of the panel nor judge in regular active service on the Court having requested that the Court be polled on rehearing in banc, Rule 35, Federal Rules of Appellate Procedure, the suggestion for rehearing in banc is denied.