947 F.2d 953
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Jo Ann KING, Petitioner-Appellee,
v.
John SHANKS, Acting Warden, Respondent-Appellant.
 No. 91-2010.
 United States Court of Appeals, Tenth Circuit.
 Oct. 30, 1991.
 
 Before STEPHEN H. ANDERSON, BARRETT and TACHA, Circuit Judges.
 ORDER AND JUDGMENT*
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 2
 Respondent appeals from the district court Order granting Petitioner's Petition for a Writ of Habeas Corpus, 28 U.S.C. § 2254, and vacating Petitioner's New Mexico conviction for armed robbery, after concluding that Petitioner was denied effective assistance of counsel. Petitioner asserted, inter alia, that she was denied effective assistance of counsel because her court-appointed attorney labored under a conflict of interest resulting from his joint representation of both Petitioner and her Codefendant. Petitioner asserts that defense counsel's joint representation prevented him from discovering a viable duress defense which could have been asserted on Petitioner's behalf.
 
 
 3
 Although Petitioner did not raise this issue in her direct appeal, she did assert this claim in a pro se motion for post-conviction relief. Without conducting an evidentiary hearing, the state court considered Petitioner's claims on the merits, summarily ruling that Petitioner's claims lacked merit. The New Mexico Supreme Court denied an ensuing petition for certiorari. There are, therefore, no state court findings of fact concerning the ineffectiveness claim to which we must accord a presumption of correctness. See 28 U.S.C. § 2254(d). See generally Strickland v. Washington, 466 U.S. 668, 698 (1984) (state court's conclusion concerning existence of conflict of interest is mixed question of law and fact not entitled to § 2254(d)'s presumption of correctness).
 
 
 4
 In response to Petitioner's § 2254 petition, the district court conducted a hearing upon the ineffective assistance claim and concluded Petitioner had been deprived of effective representation. This court will review the district court's findings of fact under a clearly erroneous standard. Osborn v. Shillinger, 861 F.2d 612, 626 (10th Cir.1988). The district court's determination that Petitioner's defense counsel was ineffective, however, because it is a mixed question of law and fact, will be reviewed de novo. See Strickland, 466 U.S. at 698. Upon careful review of the record, we affirm.
 
 
 5
 The testimony of Petitioner, her Codefendant, and defense counsel adduced at the evidentiary hearing, indicated the following: Petitioner, along with her two sons, lived with her Codefendant, Jim Masci, in Las Cruces, New Mexico, for less than a year. II R. at 58. During the time frame surrounding the armed robbery, which occurred on June 17, 1984, Mr. Masci used drugs on a consistent basis. See id. at 62, 81-82. When he was in need of drugs, Mr. Masci became violent and abusive toward Petitioner. See id. at 58-62, 68-69, 81, 90-91. In order to remove herself and her sons from this violent environment, Petitioner, in April 1984, took her sons and left Mr. Masci. Id. at 58. Petitioner and her children went to Ruidoso, New Mexico, id., where they stayed with a friend, Joanie Doughten, id. at 63.
 
 
 6
 Mr. Masci caught up with Petitioner and her boys in Ruidoso. Id. at 58, 62. At that time, Mr. Masci was in a "frantic" state, being in need of drugs. Id. at 63. While at Ms. Doughten's, Mr. Masci physically threw Petitioner around, hit her, and threatened to kill her. Id. at 60, 90. He insisted Petitioner accompany him everywhere he went. Id. at 63-64.
 
 
 7
 Petitioner, wishing to remove both Ms. Doughten's family and her own two boys from Mr. Masci's violence, took her two boys to the nearby cabin of another family friend. Id. at 63. Ms. Doughton's teenage son stayed with Petitioner's children at the cabin while Mr. Masci compelled Petitioner to accompany him in his attempts to obtain the prescription drug Percodan, id. at 64, 82, which can be used as a substitute for heroin, id. at 82.
 
 
 8
 Mr. Masci, who was in possession of a gun, decided to commit an armed robbery to get the money he needed for drugs. Id. at 82-83. Petitioner tried to talk him out of this idea, stating there were other ways to get the money he needed. Id. at 83. Petitioner suggested they might borrow money from Ms. Doughten. Id. at 65, 83.
 
 
 9
 To that end, the couple drove to the restaurant where Ms. Doughten worked. Id. at 65, 83. While Defendants were parked behind the restaurant waiting for Ms. Doughten to arrive for work, the four victims drove up to the restaurant to have dinner. Id. at 83. Since the victims had a "nice fancy car and they were at a fancy restaurant," Mr. Masci decided that it would be worthwhile to rob them. Id. at 83. When Mr. Masci told Petitioner that he intended to rob these people, however, Petitioner started to get out of the car, asserting she would have no part in a robbery. Id. at 67, 84. Mr. Masci, still in possession of the gun, id. at 66, hit Petitioner across the face and pulled her back into the car, id. at 67, 69-70, 84. He then told her that he would take the victims, in their own car, to a secluded place and rob them. Id. at 67, 84. Petitioner was to follow at a safe distance and pick him up. Id. at 67, 84.
 
 
 10
 As Mr. Masci outlined his plan, Petitioner made up her mind to drive away once he got out of the car. Id. at 67. At this point, however, Mr. Masci told Petitioner that if she "intended to screw him over," he would get to her children before she would. Id. at 67; see also id. at 85 ("I remember exactly saying if she screwed me over, I would screw her over, I knew where the kids are at, there is no way she could get there before I could. I told her, 'You think about that before you decide to screw me over.' "). Petitioner asked Mr. Masci not to hurt the victims, to which he replied that he was going to do what he had to do to get the money. Id. at 84.
 
 
 11
 Petitioner, now believing she had no choice but to go along with the robbery, offered an alternative plan. Because she feared that Mr. Masci, in his agitated state, would harm the victims, who were older, if they resisted, Petitioner suggested that she rob the victims while they were still in the restaurant parking lot. Id. at 67-68, 84. Mr. Masci agreed, but before giving Petitioner the gun he removed the bullets, id. at 68, 85, "because she was kind of upset with me anyway and I wasn't going to give her a gun with bullets in it because I had already threatened her and I had threatened her kids...." Id. at 85.
 
 
 12
 When the victims returned to their car, see id. at 18, Petitioner, holding the unloaded gun given to her by Mr. Masci, id. at 68, got in the car with the victims, id. at 70. Petitioner told the victims that she would not hurt them, that she was more afraid than they were. See id. at 24-25. Her jaw trembled so in fear that several of the victims asked if they could help her, id. at 25, to which Petitioner responded that no one could help her, id. at 25, 70.
 
 
 13
 After taking the victims' money, Petitioner fled to the back of the restaurant, where Mr. Masci had remained, out of sight, during the whole ordeal. See id. at 18. Upon returning to the car, Petitioner handed the money over to Mr. Masci. Id. at 70.
 
 
 14
 The police stopped the couple several hours later as they continued to drive around Ruidoso. See id. at 21, 25. When they were apprehended, Mr. Masci, not Petitioner, possessed the stolen money and the gun.
 
 
 15
 Petitioner asserted and the trial court found that Petitioner had committed the armed robbery for which she was convicted because she was fearful that Mr. Masci would harm the victims and because Mr. Masci had threatened to harm Petitioner's children, after physically assaulting her. Petitioner's allegations, asserted with specificity and supported by the testimony presented at the evidentiary hearing, stated a viable duress defense which, if believed by the jury, would have relieved Petitioner of criminal liability for the armed robbery. See Esquibel v. State, 576 P.2d 1129, 1132 (N.M.1978); State v. Torres, 657 P.2d 1194, 1195-97 (N.M.Ct.App.1983).
 
 
 16
 Petitioner further asserted that defense counsel failed to discover this viable defense because he did not consult with Petitioner separately, but rather always interviewed Defendants together. Petitioner did not inform defense counsel, in her Codefendant's presence, of the facts underlying the duress defense, in light of Defendants' violent relationship and the threats Mr. Masci had made against her children. Further facts adduced at the evidentiary hearing indicated that Petitioner's original defense attorney met with her individually for approximately fifteen minutes two weeks after her arrest. II R. at 72-73. Their conversation focused primarily upon the well-being of Petitioner's two children. See id. After that meeting, either original defense counsel or subsequent trial counsel met with Defendants on two other occasions prior to trial. Id. at 72-74. During these meetings, both Defendants were present at all times. Id. at 15, 34, 73; see also id. at 15 ("They were a joint entity to me at that time." (testimony of trial counsel)). Even after the state trial court directed a verdict in favor of Mr. Masci and dismissed all charges against him at the close of the state's evidence, defense counsel did not consult with Petitioner separately concerning her defense. Id. at 38-39.
 
 
 17
 Where, as here, a defendant raised no objection at trial to counsel's joint representation, "[a] defendant ... must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). Once such a showing is made, prejudice will be presumed, and petitioner will be entitled to relief. Id. at 349-50.
 
 
 18
 Under the specific facts of this unusual case, see United States v. Bowie, 892 F.2d 1494, 1500 (10th Cir.1990) (because "actual conflict" and "adverse effect" are not self-defining terms, this court looked to context of specific case presented to define these terms), it became critical to the provision of constitutionally effective assistance for defense counsel to consult with Petitioner apart from her Codefendant. Defense counsel's failure to consult with Petitioner separately and independently from her Codefendant, under these circumstances, prevented counsel from giving Petitioner a reasonable opportunity to disclose those facts which might have indicated a viable defense and thus prevented counsel's discovery of the legitimate duress defense which could have been asserted on Petitioner's behalf. See United States v. Hall, 843 F.2d 408, 412 (10th Cir.1988) (important for defense counsel to consult with defendant so counsel can learn any facts that might afford defendant legitimate defense). Counsel's failure to consult with Petitioner was a direct result of his joint representation of Defendants. Under these circumstances, we conclude that an actual conflict of interest adversely affected defense counsel's performance.
 
 
 19
 Having established that counsel labored under an actual conflict of interest, prejudice is presumed. Cuyler, 446 U.S. at 349-50. The district court, therefore, did not err in granting Petitioner habeas relief. Cf. United States v. Geittmann, 733 F.2d 1419, 1421-22 (10th Cir.1984) (conflict did not adversely affect counsel's performance where defendant failed to reveal information which would have indicated existence of actual conflict, after defense counsel made specific inquiry). The judgment of the United States District Court for the District of New Mexico is AFFIRMED.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3