**UNITED STATES of America, Plaintiff,**

v.

**MEDINA–MEDINA, et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**Juvenal GOMEZ–BARAJAS, et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**Juvenal GOMEZ–BARAJAS, et al., Defendants.**

Nos. 85–0307–JLI–Crim. to 85–0309–JLI–Crim.

United States District Court, S.D. California.

July 23, 1985.

Michael Lasater, Warren Reese and Stephen Nelson, San Diego, Cal., for U.S.

Eugene Iredale, San Diego, Cal., for Juvenal Gomez-Barajas and Javier Bravo.

Michael McCabe, San Diego, Cal., for Manuel Cretin-Sandoval.

Ramon Castro, San Diego, Cal., for Adolfo Holguin.

Richard de la Garza, Escondido, Cal., for Ester Holguin.

Juanita Brooks, San Diego, Cal., for William Tolmasoff.

Thomas Warwick, San Diego, Cal., appeared on behalf of John Hall.

David Semco, San Diego, Cal., for Mark Wheat.

George Boisseau, Chula Vista, Cal., for Angel Figueredo.

James Gattey, San Diego, Cal., for Jon Cline.

## MEMORANDUM DECISION AND ORDER

IRVING, District Judge.

Numerous defense motions in cases 85–307–JLI, 85–308–JLI and 85–309–JLI, and related case 84–1099–JLI, came on for hearing June 5, 6 & 7 and July 1, 2, 3 & 10, 1985, before the Honorable J. Lawrence Irving.

Having considered the pleadings, the testimony presented and the oral argument of counsel, the court issues the following memorandum decision.

## PROCEDURAL BACKGROUND

Following his arrest on June 27, 1984, Juvenal Gomez-Barajas was indicted, along with Ester and Adolfo Holguin, William Tolmasoff, Victor and Irina Vidal, Bridgett and Mark Witschger, Jose Manuel and Rosalla Antuna, and Manuel Lizarraga-Sanchez on July 6, 1984, in Case No. 84–646. All defendants were charged with conspiracy to possess marijuana in excess of 1,000 pounds with intent to distribute, as well as other narcotics and firearms violations.

On December 11, 1984, by way of secret indictment (unsealed December 13, 1984), Juvenal Gomez-Barajas, Victor and Irina Vidal, Adolfo and Ester Holguin, William Tolmasoff, Manuel Cretin-Sandoval, Mark Wheat, Sheryl Walsh, John Hall and fourteen others, were charged with conspiracy to possess marijuana in excess of 1,000 pounds with intent to distribute and many other narcotics, tax and firearms violations in Case No. 84–1099.[1]

On April 10, 1985, Indictments 85–307, 85–308 and 85–309 were filed. Indictment 85–307 charges Mark Wheat, Manuel Cretin-Sandoval, Angel Figueredo, Javier Bravo, John Thompson and nine others with conspiracy to possess marijuana in excess of 1,000 pounds with intent to distribute and other narcotics violations. Indictment 85–308 charges Juvenal Gomez-Barajas, Manuel Cretin-Sandoval and six others with conspiracy to possess marijuana in excess of 1,000 pounds with intent to distribute and other narcotics violations involving both marijuana and cocaine. Indictment 85–309 charges Juvenal Gomez-Barajas, Adolfo and Ester Holguin, Michael and Sheryl Walsh, William Tolmasoff, John Hall and four others with conspiracy to possess marijuana in excess of 1,000 pounds with intent to distribute and other

---

1. Indictment 84–1099 was intended to supersede indictment 84–646, but could not be assigned the same number due to the order in which defendants were listed in the caption.

narcotics, racketeering and firearms violations. These three indictments were intended to supersede Indictments 84–646 and 84–1099 and to the extent they duplicated charges in the earlier indictments, the government moved to dismiss the earlier charges. That motion was granted on April 24, 1985.

On June 5, 1985, superseding indictments were filed in case nos. 85–307 and 85–309. On July 10, 1985, a superseding indictment was filed in case no. 85–308. These supersedures made either minor or technical changes.

Defendants filed a multitude of motions in this case and the related cases. Most motions were disposed of by oral rulings at the time of the motions hearings. This memorandum decision will address defendants' motions 1) to dismiss based on alleged *Massiah* violations; 2) to dismiss based on interference with the attorney-client relationship; 3) to dismiss for prosecutorial misconduct before the grand jury; and 4) for disclosure of grand jury transcripts.

## FACTUAL BACKGROUND

Following his arrest in June, 1984, Victor Vidal was incarcerated at the Metropolitan Correctional Center (hereinafter "MCC") pending trial on Indictment 84–646. Thereafter, he retained an attorney, Howard Frank, filed pretrial motions, and remained in contact with his co-defendants. Sometime in the beginning of November 1984, Vidal decided to become a government informant. He testified before the grand jury in late November, 1984. He was released from the MCC on December 6, 1984, after his bail was reduced. After assuming the role of informant, Vidal remained in contact with some of his co-defendants, and persons soon to be indicted in case 84–1099, and with an investigator hired to assist Juvenal Gomez-Barajas, Vidal and Manuel Cretin-Sandoval in the defense of their case.

These motions arise from the contact Vidal had with Juan Antonio Lopez, the investigator, and some of the defendants in the cases before the court. The contacts will be discussed as they pertain to each defendant, however, the court is mindful that the crux of the argument favoring the remedy of dismissal of the indictment rests on the cumulative cause and effect of these contacts.

### A. *Vidal's Contacts with Juan Antonio Lopez*

After his arrest, Gomez-Barajas hired Juan Antonio Lopez, a private investigator, to assist him in the defense of his case. An ambiguous agreement was struck between Gomez-Barajas and Vidal—and following his indictment in December, 1984, Cretin-Sandoval—or more appropriately, their attorneys, to share the fruits of the investigation. The extent of this cooperation was never clearly defined in Lopez' or Vidal's testimony. It is certain, however, that Vidal did not have the funds to pay for Lopez' services.

Lopez met with Vidal seven or eight times from June through early November, 1984, while Vidal was at MCC and prior to his becoming an informant. Their discussions at these meetings focused primarily on Vidal's obtaining release on bail. Vidal's case was also discussed; Vidal and Lopez speculated about who possible informants might be. Alfred Gallegos' status as an informant was discussed and Lopez related the results of a meeting he had with Gallegos. Lopez testified that he and Vidal discussed bail and Vidal's thought's of escape from MCC at their second to last meeting. At their last meeting in early November, Lopez told Vidal that he couldn't help him anymore, and he terminated their arrangement.

Lopez testified that their relationship resumed after Vidal was released from MCC for a period of approximately two to three weeks, at which time Lopez considered himself retained by Vidal, Gomez-Barajas and Cretin-Sandoval. During this time, Lopez had four encounters with Vidal, at which time he shared information with Vidal "regarding the case." Lopez stated that some of this information had been obtained from Cretin-Sandoval. However, the informa-

tion that was shared was not specified, nor was it shared with Vidal's attorney, Howard Frank.

**B. *Vidal's Contacts with Gomez-Barajas***

Vidal had no contact with Gomez-Barajas, who had been released on bail, while he was in jail. After Vidal's release from MCC, Vidal spoke with Gomez-Barajas many times on the phone and met with him approximately ten times.

Gomez-Barajas initiated contact with Vidal after his release from MCC and arranged a meeting for December 7, 1984. At that meeting, Gomez-Barajas conveyed his apologies for not being able to contribute to a bond to secure Vidal's release from jail. He also suggested that Vidal leave the jurisdiction and go to Mexico. Following the meeting, Vidal made notes of the conversation and gave them to Drug Enforcement Administration (hereinafter "DEA") Agent Steven Dunn, Vidal's contact at DEA.[2]

In January, 1985, Vidal and Gomez-Barajas had another meeting. At that meeting Vidal attempted to induce Gomez-Barajas to view marijuana he was selling (which, in fact, belonged to DEA) at a warehouse somewhere in San Diego County. Gomez-Barajas showed an interest in purchasing the marijuana but refused to go to the warehouse; no deal was consummated.

On January 3, 1985, Gomez-Barajas and Vidal had another meeting at Love's restaurant in Chula Vista, CA. Vidal wore a body recorder to the meeting, which was surveilled by Agent Dunn. Jacinto Silva-Leos also attended the meeting, which then relocated to his home. No testimony was elicited as to the content of those discussions.

Vidal also had between ten and twenty-five phone conversations with Gomez-Barajas. There is testimony, not ascribed to any date or meeting, that the identity of

possible informants was discussed between Gomez-Barajas and Vidal, including the possible cooperation of Manuel Antuna, another co-defendant.

**C. *Vidal's Contacts with Cretin-Sandoval***

Vidal is Cretin-Sandoval's brother-in-law. Prior to Cretin's arrest on December 13, 1985, Vidal met with him and later assisted DEA agents in arresting him by disclosing Cretin-Sandoval's location at the Early California Motel in Chula Vista, CA. Vidal and Cretin-Sandoval had no contact while Cretin-Sandoval was held in MCC, after his arrest.

One or two days after Cretin-Sandoval's release from custody, Vidal and Cretin-Sandoval conversed, discussing "things he (Cretin-Sandoval) had done prior to his arrest" and "facts underlying the case." Cretin-Sandoval and Vidal continued to talk on almost a daily basis. In their conversations, they discussed Cretin-Sandoval's past involvement in the case, other facts involving the case and who might possibly be a government informant. During these conversations, Vidal denied being an informant and offered to intercede with Gomez-Barajas on Cretin-Sandoval's behalf to obtain Gomez-Barajas' financial assistance for attorney's fees. Vidal testified that he passed all this information onto Agent Dunn.

During this time period, Vidal also borrowed a van from Cretin-Sandoval to transport marijuana in another investigation in which Vidal was participating.

Vidal testified he had one other encounter with Cretin-Sandoval at the Early California Motel. At that meeting Cretin-Sandoval reviewed a box of reports and documents provided to him by his attorney. Cretin-Sandoval told Vidal that he had paid his attorney to acquire those reports but that he did not mind the expense because

---

**2.** After Vidal became an informant, Dunn and Vidal established a routine where Vidal created notes and then turned them over to Dunn, within a day or two of their execution. These notes contained contemporaneous records of encoun-

ters with defendants in this case and targets in other investigations, and Vidal's recollections of past events. To the Court's knowledge, this procedure was followed through May, 1985.

"he wanted to find out about everything." When Cretin-Sandoval reviewed those documents in Vidal's presence, he did not, however, explain to Vidal how he was going to defend his case.

### D. *Vidal's Contact with Tolmasoff and Adolfo Holguin*

Tolmasoff was incarcerated on the same floor at MCC with Vidal for a five-day period after Vidal decided to become an informant. However, Vidal did not relate any conversations he had with Tolmasoff to government agents.

On December 19th or 20th, 1984, Adolfo Holguin phoned Vidal and told him that he was bringing Tolmasoff to visit him. Holguin complained to Vidal that Tolmasoff was pressuring him for money. When Tolmasoff and Holguin arrived at Vidal's home, the three men conversed in the driveway. Tolmasoff repeated to Vidal that he wanted money. Vidal assured him that he would ask Gomez-Barajas for money, though his testimony reveals that he never did. This conversation was reported to Agent Dunn.

In the beginning of January, 1985, Tolmasoff and his brother visited Vidal at his residence. Tolmasoff was angry, and requested that Vidal speak to Gomez-Barajas because if he did not "make money soon," he was going to start cooperating with the police. Vidal once again represented that he would speak to Gomez-Barajas. This conversation allegedly was also reported to Agent Dunn.

Approximately a week before Christmas, 1984, Tolmasoff and Holguin traveled to El Centro to meet with Vidal, who was there to meet with his family. They met at the Travelodge Motel where Vidal was staying. Upon meeting, Vidal gave Tolmasoff some money.[3] They went to a restaurant, ate dinner and then had a few drinks at a bar. Vidal testified that they discussed the case and that they may have possibly discussed the fact that one of the receipts for guns recovered in a search of Tolmasoff's resi-

dence was found in Vidal's car when he was arrested and the possible defense that fact provided Tolmasoff. Vidal asserts that later that evening he made notes of their meeting and conversations, which he gave to Dunn. He did not indicate in his notes, or verbally inform Dunn, that he had given Tolmasoff money.

Vidal and Holguin conversed at least fifteen times by telephone. The government consensually recorded two or three of those conversations, though their content was not presented to the court.

Vidal had at least two more encounters with Holguin. Vidal called Holguin on one occasion asking for money. Holguin honored the request and in the end of December or first part of January gave Vidal $500.00. Vidal asserts that he reported this in one of the notes turned over to Agent Dunn.

Vidal had his last encounter with Holguin sometime in mid-March, 1985. Vidal asked Holguin if he wanted to deal with a drug trafficker, Simon Murrillo, that Vidal had contact with. Holguin refused the deal. The agents working with Vidal were made aware that this offer and rejection had occurred.

### E. *Vidal's Contact with John Hall*

After he became an informant, Vidal was in John Hall's company on one occasion in January, 1985. Their meeting was surveilled by agents, and began at a 7-Eleven convenience store, north of Escondido, California. Vidal had traveled to this site with Cretin-Sandoval, who intended to meet Hall to discuss financial affairs relating to marijuana sales. Hall's brother was also in attendance. The meeting was conducted in English and Vidal, who speaks Spanish, was not able to understand much of it. After the meeting Cretin-Sandoval recounted his discussions with Hall to Vidal. Cretin-Sandoval told Vidal that the government had seized from Hall machine guns and silencers that belonged to Cretin-San-

---

**3.** Vidal's testimony is inconsistent as to the sum rendered. At one point Vidal testified that he gave Tolmasoff $300.00, at another time he testified that he gave Tolmasoff only $150.00.

doval and Hall had agreed to claim that he was their owner. Vidal asserts that he passed this information to Agent Dunn by way of notes he made soon after his encounter with Cretin-Sandoval.

### F. Vidal's Contact with Ester Holguin

Vidal spoke with Ester Holguin three or four times by phone, after he became an informant. He states that his conversation with her was limited to inquiry about Adolfo Holguin's whereabouts and that they did not discuss the case.

### G. The Government's Instructions to and Receipt of Information from Vidal

Maria Arroyo-Tabin was the prosecutor initially assigned to these cases, and the prosecutor on the case when Vidal decided to become an informant. She testified that she received no information about defense strategy at any time. Michael Lasater, the prosecutor presently assigned to the case, has also represented to the court that he has received no information about defense strategy.

Vidal's relationship with the government has been almost exclusively maintained through his dealings with Agent Dunn. Both Vidal and Dunn testified to the understanding the two had reached regarding Vidal's role as an informant.

Vidal's agreement to cooperate with the government in November, 1984, resulted from negotiations between Maria Arroyo-Tabin, Agent Dunn, DEA Agent Tim Tierney, U.S. Customs Agent Steven Jeffrey, Howard Frank and Vidal. No promises were made regarding dismissal of charges or recommendations by the government at the time of Vidal's sentencing. Vidal is not a permanent resident in the United States and the government promised that neither he nor his family would be deported to Mexico. The government also promised that once Vidal testified before the grand jury, which he did, that they would recommend that his bail be reduced, which they did. These concessions were made by the government in exchange for complete cooperation from Vidal, Vidal's testimony against Gomez-Barajas, and Vidal's promise to report to Dunn anything he heard out on the streets regarding persons targeted in certain ongoing investigations operated by Dunn. Dunn also requested Vidal to gather information about drug trafficking, including efforts by the defendants to traffic.

Vidal and Dunn conversed a day or two after Vidal was released on bail, and it was at that time that Dunn provided Vidal with instructions for his actions as an informant. Vidal was told to act in character, and to remain in contact with his co-defendants, for his own safety while on bail as well as to augment his effectiveness as an informant. Dunn also expressly informed Vidal that he did not want him to seek from defendants, or relate to him, any information regarding defense strategy in the pending case. (Dunn also told Ms. Arroyo of his plans to have Vidal contact defendants in the then-pending case.)

Vidal then described to Dunn his last contacts with Gomez-Barajas, Cretin-Sandoval and Tolmasoff and allegedly provided the notes he had made regarding those contacts to Dunn. Vidal informed Dunn that Gomez-Barajas had hired an investigator, Lopez, to do an investigation. Vidal also told Dunn that Lopez was investigating the identity of persons suspected to be informants in the case and their background.

Vidal and Dunn had almost daily contact. Dunn testified that Vidal did locate Cretin-Sandoval for the DEA (for his arrest). Dunn also stated that no defense strategy of Gomez-Barajas' or Cretin-Sandoval's was passed on to him, although Vidal did apprise Dunn of the fact that he thought Cretin-Sandoval might fugitate prior to trial in the pending case.

Vidal assisted the DEA in investigations not involving defendants in these cases, and as a result, other indictments were filed. Seizures of large quantities of marijuana were made as a result of his taped conversations with Adolfo Holguin; how-

ever, charges against Holguin arising from these seizures had not been brought at the time Dunn testified. No new charges were brought against other defendants in these cases as a result of Vidal's contacts with them.

### H. *Defense Meeting at the Frank & Milchen Law Offices*

On January 29, 1985, at 1:30 P.M., Joseph Milchen, attorney for Irina Cretin-Sandoval, called a defense strategy session for attorneys representing defendants in case 84–1099. Prior to the commencement of that meeting, it was specified by one or more of the attorneys present that the subject of conversation was protected by the attorney-client privilege. During the course of the meeting, an attempt to formulate an overall defense strategy was made. The meeting was presided over by Milchen, and Michael McCabe, Cretin-Sandoval's attorney, was in attendance. The court does not have before it a clear record of the other lawyers in attendance at the meeting, however, it is undisputed that neither Howard Frank nor Victor Vidal were present. There is also nothing in the record that suggests that any information disclosed at this meeting was conveyed to Vidal, Dunn or the prosecutors.

### I. *The July, 1985, Seizure of Gomez-Barajas' Home*

On July 1, 1985, counsel for Gomez-Barajas filed a motion to dismiss for repeated instances of government misconduct. This motion is based on the government's alleged filing of needless charges against Gomez-Barajas and repeated interferences with Gomez-Barajas' sixth amendment rights, as set forth in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The court took additional evidence on the incidents that prompted the filing of this motion. Evidence pertaining to this motion will be considered along with those alleging sixth amendment violations already on file.

On the morning of June 24, 1985, DEA agents seized Gomez-Barajas' home on Sunnyview Drive, Bonita, California, pursuant to 21 U.S.C. § 881(a)(6). When agents entered the home, Gomez-Barajas' children and nephew were there, but Gomez-Barajas and his wife, Refugio, were not. Forty minutes after the agents entered the home, Gomez-Barajas and his wife arrived. They were searched and then sent to different rooms in the house. Gomez-Barajas was informed that his house was being seized and that agents were taking an inventory of items in the home. Gomez-Barajas was given a copy of the seizure warrant. One of the agents executing the seizure, Edmundo Apodaca, "invited" Gomez-Barajas into one of the bedrooms of the home and had a conversation with him. The five minute conversation was not witnessed by any other DEA agents or Gomez-Barajas' family. Apodaca told Gomez-Barajas that he was interested in speaking with him about a person named "Acuna." Apodaca also told him that he knew his case was pending and that he had no desire to talk with him about the case. Apodaca was aware that Gomez-Barajas was represented by counsel. Apodaca told Gomez-Barajas that if he were interested in cooperating he could "do something" in Gomez-Barajas' behalf.

On June 28, 1985, Gomez-Barajas was arrested while picking up property that had been seized earlier that week at the DEA office in Chula Vista, California.[4] Gomez-Barajas was transported from Chula Vista to downtown San Diego by Agent Dunn. During the brief ride, Dunn inquired whether Gomez-Barajas was ready to cooperate with authorities.

### DISCUSSION

### I. *Motion to Dismiss for Violation of Massiah v. United States*

The only issue presented for this court's consideration is whether the behavior of

4. Gomez-Barajas was arrested because the collateral for his bail bond—his home in Bonita, California,—had been forfeited earlier in the week and the magistrate issuing the arrest warrant felt there was not sufficient collateral left in the bond to insure his appearance at court proceedings.

the government and its informant, Vidal, alleged by defendants[5] to violate sixth amendment rights expressly recognized in *Massiah v. United States, supra,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, warrants the remedy of dismissal of the indictment. The government has stipulated that it will not offer as evidence in either its case-in-chief or rebuttal any of the defendants' post-indictment statements to Vidal after he became an informant. The court accepts the stipulation and so orders.

■ A defendant's sixth amendment right to counsel protects him from use against him at his trial evidence of his own incriminating words deliberately elicited from him by government agents, without counsel present, after he has been indicted. *Massiah, supra,* 377 U.S. at 206, 84 S.Ct. at 1203. The Sixth Amendment applies to both statements elicited by persons who have been identified to the defendant as government agents as well as statements elicited in surreptitious encounters with persons acting undercover. *Id.; United States v. Henry,* 447 U.S. 264, 273, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980).

There is no question in the case at hand that Vidal was acting as a confidential informant and maintained an "agency" relationship with the government. It is also clear that defendants' sixth amendment rights, which triggered when they were indicted,[6] were, in part, infringed.

However, not all Vidal's contacts with defendants were in violation of their sixth amendment rights. Agent Dunn communicated to Vidal his suspicion that defendants would continue to traffic drugs after they were indicted. Some of Vidal's contacts with defendants revealed evidence of post-indictment criminal acts. Gomez-Barajas' suggestion that Vidal absent himself from the United States in violation of his bail bond and presumably in order to make himself unavailable to stand trial would be a separate criminal act, and one for which he is not on trial. Similarly, Vidal's borrowing of Cretin-Sandoval's van to transport marijuana in another investigation can also be classified as new, potentially criminal activity, if even that.[7] Vidal's mid-March, 1985 offer to Holguin to connect him with alleged drug traffiker Simon Murillo also concerns new, potentially criminal, activity.

It is entirely proper for the government to continue investigation of the suspected criminal activities of a defendant even though he has already been indicted: *"Massiah* offers no immunity from liability for uncounseled, post-indictment statements that involve(d) criminal acts or constituted criminal acts in them-selves." *United States v. Moschiano,* 695 F.2d 236, 240 (7th Cir.1982) *cert. denied,* —— U.S. ——, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983).

Other conversations between Vidal and the defendants were not incriminating, and in fact, were innocuous. For example, Gomez-Barajas' statement of apology to Vidal, bemoaning his inability to assist Vidal in gathering bail money is not incriminating. Likewise, Cretin-Sandoval's comments about the acquisition of the government reports, provided to his attorney in

---

**5.** Most of the defendants in the three cases joined in this motion, initially filed by Gomez-Barajas and supplementally briefed by Tolmasoff. The court finds that only defendants who made post-indictment statements to Vidal have standing to join in the motion. They are Gomez-Barajas, Cretin-Sandoval, Tolmasoff and Adolfo Holguin.

There is no evidence before the court that Vidal elicited any statements from John Hall; the evidence before the court shows only that Vidal observed the meeting at 7-Eleven. The later description provided by Cretin-Sandoval of the meeting was not deliberately elicited *from Hall.*

Ester Holguin does not have standing to join the motion. To the extent that her brief conversation with Vidal was a "statement," it was innocuous and not incriminating.

**6.** *See Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (sixth amendment right to counsel attaches at indictment); *United States v. Geittmann,* 733 F.2d 1419, 1425 (10th Cir.1984) (Sixth Amendment right to counsel at post-indictment police interrogations).

**7.** The record is not clear as to whether Cretin-Sandoval's loan of the van was unwitting or whethcr he was informed that it would be used in narcotics-related activity.

the discovery process, are innocuous. Tolmasoff's requests for monetary assistance from Vidal or Gomez-Barajas, as well as his suggestion that he might cooperate with the government, are also not incriminating.

Based on the record before the court, there can be no assumption the defendants' sixth amendment rights were violated during the numerous phone conversations with Vidal, regardless of who initiated the calls. *See United States v. Muzychka,* 725 F.2d 1061 (3rd Cir.) *cert. denied* — U.S. —, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984) (it is irrelevant who initiates calls or conversation after sixth amendment right attaches and government agent had deliberately elicited information from defendant).

However, the court finds that incriminating statements were elicited which could be highly prejudicial to defendants if used at their trials. It is necessary to identify those statements, in order to evaluate whether they were elicited in violation of *Massiah,* and, if they were, if dismissal of the indictment is warranted. First, Vidal's discussions with Cretin-Sandoval about "the facts of the case" and Cretin-Sandoval's past behaviour are incriminating, as are Cretin-Sandoval's statements to Vidal after the meeting at the 7-Eleven regarding Hall's agreement to claim ownership of his guns and silencers. Second, Tolmasoff's statements to Vidal about his possession of the guns, for which Vidal had one of the receipts, is also incriminating.

One of the preliminary inquiries facing the court is whether these incriminating statements were deliberately elicited, as in *Massiah,* or whether the government created a situation likely to induce defendants to make incriminating statements without the assistance of counsel, as was present in *Henry. See United States v. Harris,* 738 F.2d 1068, 1071 (9th Cir.1984) (the determinative issue is not informant's subjective intentions, but rather whether government officials created a situation which would likely cause defendant to make incriminating statements). In *Massiah,* a co-defendant invited Massiah to discuss the pending case with him in his car, which had a radio transmitter under the front seat. An agent equipped with a recording device was parked near the co-defendant's car and overheard the transmitted, incriminating conversations. There is no indication in the record before the court that Vidal directly inquired about Cretin-Sandoval's involvement in the case, Cretin-Sandoval's agreement with Hall regarding ownership of the guns or silencers, or Tolmasoff's intention to demonstrate at trial that guns found in his possession were Vidal's. There is also no indication that the government instructed Vidal to make such inquiries.

While Vidal's behavior can be distinguished from the deliberate information-seeking situation of *Massiah,* it is more closely akin to the situation presented in *Henry.* In *Henry,* defendant's cellblock mate had been a confidential informant for the Federal Bureau of Investigation (hereinafter "FBI"). In a conversation with an FBI agent during his stay in custody, the informant told the agent that he was housed in the same cellblock as Henry and other federal prisoners. The agent told the informant to be alert for any statements made by the federal prisoners, but not to initiate any conversation with, or question, Henry about his pending bank robbery charges. The informant later reported to the agent what Henry told him about the robbery, and subsequently testified against Henry at trial. The Supreme Court found that the government had created a situation which would likely cause a defendant to proffer incriminating statements. *Henry, supra,* 447 U.S. at 274, 100 S.Ct. at 2188. *See also Geittmann, supra,* 733 F.2d 1419 (sixth amendment rights violated and new trial ordered where co-defendant, after agreeing to cooperate with government, taped incriminating telephone conversations with defendant, after defendant's indictment, and inculpatory statements were presented at trial).

The situation created by the DEA in the case at hand is similar to that created in *Henry.* Though Vidal and his co-defendants were not trapped in a custodial envi-

ronment, Vidal was intentionally injected back into a society where he was likely to have contact with the defendants, and was in fact, instructed to listen for and report back information about drug trafficking activities, including that of defendants. The court recognizes the fact that Vidal was not in a witness protection program at the time of his release from prison, and that if he were unable to relocate, his safety might necessitate "acting in character" and remaining in contact with defendants; however, the government was aware at the time of his release that a dual purpose would be served if he remained in contact with certain defendants.

■ Considering all the evidence presented, the court finds that the DEA created a situation that was likely to induce defendants to make incriminating statements without the assistance of counsel. Vidal's mission to develop drug trafficking information, DEA's awareness of his past friendship and involvement with certain defendants and Vidal's reentry into his past society create such a situation. The issue now becomes whether the creation of a situation likely to evoke damaging statements, and which, in fact, did elicit a number of incriminating statements (though there is no indication that those statements are to be used at trial), warrants the imposition of the remedy of the dismissal of the indictment.

The court can find no case where violation of a defendant's sixth amendment right to counsel in the aforementioned fashion warranted the remedy of dismissal of the indictment. Indeed, no court has expanded the issue beyond an inquiry whether statements violative of the Sixth Amendment may be used against the accused at trial. *See e.g. Henry, supra,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115; *Geittmann, supra,* 733 F.2d at 1419; *Harris, supra,* 738 F.2d at 1068. A survey of the case law reveals that courts have never levied the harsh remedy of dismissal of the indictment for violation of the sixth amendment right to counsel in the absence of outrageous government misconduct. *See*

*United States v. Glover,* 596 F.2d 857, 864 n. 12 (9th Cir.) *cert. denied,* 444 U.S. 857, 100 S.Ct. 117, 62 L.Ed.2d 76 (1979); *see generally, United States v. Rogers,* 751 F.2d 1074, 1076–80 (9th Cir.1985). The court feels that the sixth amendment violations that did occur were not so outrageous that dismissal of the indictment is warranted; prohibition of governmental use at trial of any of the statements in question will preserve defendants' rights and sufficiently sanction the government.

## II. *Motion to Dismiss for Interference with the Attorney-Client Relationship*

■ Defendants contend that the acquisition of defense strategy information by Vidal during his contact with them was an intentional interference with their attorney-client relationships. As such, they argue that the indictment should be dismissed because they are now prejudiced and will be unable to adequately defend their cases. They also argue that Vidal's activities, including borrowing money from and giving money to defendants, discussion of the pending case with defendants and attempts to embroil defendants in new criminal activity warrant dismissal of the indictment.

The sixth amendment right to counsel has been construed as a right to effective assistance of counsel. *See Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); Note, *The Sixth Amendment Implications of a Government Informer's Presence at Defense Meetings,* 93 U. Dayton L.Rev. 535, 536 (1984). Before the court can analyze whether defendants' rights to effective assistance of counsel and to a fair trial have been infringed, it is necessary to sort through the record and determine what behaviour on the part of the government and its "agent," Vidal, threatens these rights.

Motions initially filed by defendants suggested that information shared at the defense strategy meeting at the Frank & Milchen offices was conveyed to Vidal, and then possibly passed to the government. The facts do not support this allegation.

Vidal did not attend that meeting, nor did his attorney Howard Frank. There is no evidence before the court that suggests that any defendant possessed knowledge of the discussions at this meeting and/or passed it on to Vidal.

Vidal's contacts with Lopez, the investigator, also do not support the allegation that defense information had been siphoned through Vidal to the government. There was a general statement by Lopez that he shared with Vidal information regarding the case after Vidal's release from MCC. However, Lopez did not specify what information was shared. In response to the court's inquiry about a similar allegation made by Lopez about his discussions with Vidal preceding his release from MCC, the information "about the case" turned out to be speculation about who the informants in the case might be and information about one suspected informant, Alfred Gallegos.

Speculation about the government's reliance on information provided by informants was engaged in by both Gomez-Barajas and Cretin-Sandoval in Vidal's presence. The court does not think that such speculation is properly classified as defense strategy. Impeachment of any witness, most especially an informant, is usually anticipated by government counsel in every case. The identities of the informants testifying at trial has since been disclosed to defendants, and they have been provided an opportunity to question the informants, pursuant to an order of this court.

The information that defendants had retained an investigator, in and of itself, is also not defense strategy information. Even if it were, Vidal had acquired this knowledge prior to his decision to become an informant and there is no evidence before the court to suggest that he agreed to enter into the agreement to share Lopez' services with Gomez-Barajas for any purpose other than defense of his case.

Vidal's elicitation of two specific pieces of information from Cretin-Sandoval, as well as general information about the case, can be defined as acquisition of defense strategy and information, and requires more extensive analysis. Cretin-Sandoval's plan to have Hall testify that he owned the guns and silencers is clearly a defense strategy and not a routine one, though it was not the product of government infiltration into confidential attorney-client communications. Similarly, Tolmasoff's plan to emphasize the fact that a receipt for one of the guns found in a search of his home was recovered by police from Vidal, could be characterized as a defense strategy.

Vidal's acquisition of this information cannot be evaluated in isolation from other relevant facts. Vidal was expressly instructed not to seek, or relate to Agent Dunn, any defense strategy information. The record hints that the disclosures by defendants Cretin-Sandoval and Tomalsoff were passed onto Dunn via one of Vidal's notes, but the court has reviewed all notes turned over to Agent Dunn by Vidal *in camera* and finds that *this information was not conveyed in any note turned over to Dunn.*

> "Government intrusion into the attorney-client relationship, although not condoned by the court, is not of itself violative of the Sixth Amendment right to counsel. Rather the right is only violated when the intrusion substantially prejudices the defendant. Prejudice can manifest itself in several ways. It results when evidence gained through the interference is used against the defendant at trial. It also can result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial."

*United States v. Irwin,* 612 F.2d 1182, 1186–87 (9th Cir.1980). The court finds that there is no evidence to suggest that any defendant has been prejudiced by Vidal's acquisition of information; there is no evidence that this information was passed along to Dunn or to the prosecutors. Whether the informant had conveyed the information he acquired to prosecutors or

agents was a dispositive factor considered by the Supreme Court in its determination of whether sixth amendment rights were violated in *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). In *Weatherford,* an informant attended a meeting between the defendant and his counsel, at their request, for the purpose of securing information or suggestions regarding the defendant's defense. The court reversed the civil judgment in the 42 U.S.C. § 1983 action for *Bursey* because it found that there was no use of tainted evidence in the case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford. Thus, it concluded that there was no violation of the Sixth Amendment, as it applied to the States by virtue of the Fourteenth Amendment. *Id.* at 558, 97 S.Ct. at 845.

In the instant case, there is no suggestion that Dunn purposefully urged Vidal to acquire defense strategy information, nor is there conclusive evidence that such information was conveyed to him or to any other government official. Of course, the court cannot know at this time whether "tainted" evidence might be used at trial, but the government is prevented from using the statements themselves and defendants may renew their motion to dismiss at trial, if necessary.

Defendants urge the court to follow the Third Circuit's use of the sanction of dismissal in *United States v. Levy,* 577 F.2d 200 (3d Cir.1978). However, the facts in *Levy* are distinguishable from those presented in the instant case. In *Levy,* DEA agents sought and received information from a confidential informant who they knew to be represented by the same attorney that represented the defendant in the case. While dismissal was the only appropriate remedy in that situation, it is not called for in the instant case.

The method of analysis employed thus far has sought to isolate and categorize Vidal's contacts with defendants, rather than accumulate them. Defendants' urge that when Vidal's behaviour, and the behaviour of government agents in this case is considered *in toto,* it warrants dismissal of the indictment. The court disagrees. In sum, there were a few instances where statements were elicited in violation of the Sixth Amendment, however, there was no interference with defendants' attorney-client relationship. Vidal's taking and lending of money is not to be encouraged, but the court is certain that defense counsel will use evidence of this financial interaction to its advantage at trial. As discussed previously, the government may continue to investigate ongoing and new criminal activity. To the extent that defendants are later charged with crimes as a result of their involvement with Vidal, defendants may present a defense of entrapment or overreaching governmental misconduct. Finally, the court feels that Agent Apodaca's tête-à-tête with Gomez-Barajas during the seizure of his house was infelicitous and unwise. However, that behaviour alone, or when considered in light of all other factors of this case, does not warrant dismissal of the indictment.

III. *Motion to Dismiss for Prosecutorial Misconduct Before the Grand Jury*

 Defendants speculate that there must have been prosecutorial misconduct before the grand jury, because the facts as they interpret them do not support the charges in the indictment. They also allege that a grand jury witness, Guillermo Mesa, Gomez-Barajas' accountant, was harassed and placed in the uncomfortable position of having to invoke the Fifth Amendment numerous times even though the government was well aware that he intended to invoke the Fifth Amendment. The declaration of Warren Reese, filed March 29, 1985, refutes this characterization of Mesa's presentation to the grand jury. The facts do not suggest misconduct.

 The motion as a whole is unmeritorious at this time. An indictment returned by a legally constituted and unbiased grand jury, valid on its face, is sufficient to call for trial of the charge on the merits. *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). There

is not a scintilla of evidence before the court at this time to suggest that the prosecutors misconducted themselves before the grand jury. Applying the *Costello* rule to the facts before the court in this case, defendants' challenge to the indictment on the ground that it is not supported by adequate or competent evidence is rejected. *See United States v. Addington,* 471 F.2d 560, 568 (10th Cir.1973). If it is later discovered that defendants' allegations regarding the discrepancy between the offenses charged and the evidence presented are true, they will prevail at trial with an acquittal or by motion to dismiss for prejudicial variance.

### IV. *Motion to Disclose Grand Jury Transcripts*

This motion requests the court to order the disclosure of grand jury transcripts containing information that would support defendants' motion to dismiss for prosecutorial misconduct before the grand jury. Defendants argue that they need grand jury transcripts of witness testimony and prosecutors' legal instruction to the grand jury in order to prove that misconduct occurred.

Defendants' motion to dismiss is based on much speculation, and unfounded mischaracterization of government decisions to dismiss charges. Accordingly, the court finds no persuasive reason for ordering disclosure of grand jury testimony or instruction that the defendants are not otherwise entitled to under the Jencks Act, 18 U.S.C. § 3500.

### ORDER

Defendants' motions to dismiss for violation of *Massiah,* interference with the attorney-client privilege and government misconduct before the grand jury are DENIED. The motion to disclose grand jury transcripts is also DENIED.

IT IS SO ORDERED.