4 F.3d 904
 39 Fed. R. Evid. Serv. 527
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert E. JOHNSON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles Edwin NOTTINGHAM, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dee Dee ROMO, a/k/a Deidre Harrell, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gerald Lee CARROLL, Defendant-Appellant.
 Nos. 92-5008, 92-5016, 92-5017 and 92-5021.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 9, 1993.
 
 Stephen J. Greubel and Robert Nigh, Jr., Asst. Federal Public Defenders, Tulsa, OK, each submitted a brief for defendant-appellant Robert Earl Johnson.*
 Jill M. Wichlens, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the brief), Denver, CO, for defendant-appellant Charles Edwin Nottingham.
 John H. Hagler, Dallas, TX, for defendant-appellant Dee Dee Romo, a/k/a Deidre Harrell.
 Robert R. Nigh, Jr., Asst. Federal Public Defender (Stephen J. Greubel, Asst. Federal Public Defender on the brief), Tulsa, OK, for defendant-appellant Gerald Lee Carroll.
 Susan W. Pennington, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty., with her on the brief), for plaintiff-appellee U.S.
 Before McKAY, Chief Judge, GODBOLD,** and SEYMOUR, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 Robert Earl Johnson, Charles Edwin Nottingham, Gerald Lee Carroll, and Dee Dee Romo, also known as Deidre Harrell,[1] appeal their convictions for conspiracy to commit bank robbery, 18 U.S.C. Sec. 371 (1988), and bank robbery, 18 U.S.C. Sec. 2113(a) and (d) (1988); id. Sec. 2(b) (1988).[2] Mr. Johnson and Mr. Carroll were also convicted of possessing a firearm in the commission of a crime of violence, 18 U.S.C.A. Sec. 924(c) (West Supp.1993). Defendants appeal their convictions and sentences on various grounds.[3] We affirm the convictions and remand for resentencing of Mr. Nottingham and Ms. Harrell to maximum sentences on count one where their current sentences are excessive.
 
 I.
 
 2
 In the original indictment, Monty Wood was also charged in connection with the bank robbery. Shortly after his arrest, Mr. Wood approached the government on the advice of his counsel, Ronald Mook, and indicated his willingness to cooperate. The government did not offer Mr. Wood a deal at that time. Mr. Mook and Mr. Wood then decided to tape record Mr. Wood's telephone calls with other members of the conspiracy. Mr. Wood subsequently pled guilty to conspiracy to rob a bank and testified against defendants at trial. The following facts are primarily taken from his testimony.
 
 
 3
 Ms. Harrell, a friend of Mr. Wood, was employed as a vault teller at the Cimarron Federal Savings and Loan Association and has worked at several other banks in the Tulsa area. Several weeks before the robbery, Ms. Harrell was discussing financial problems with Mr. Wood and told him that for "a couple of thousand dollars we could turn somebody onto a lot of money." Rec., vol. XII, at 394-95. She said that she was talking about the bank where she worked. A few days after that conversation, Mr. Wood met with Mr. Nottingham and relayed what Ms. Harrell had said. Mr. Nottingham said he thought he knew someone who could do the job.
 
 
 4
 Mr. Wood then contacted Ms. Harrell to find out if she was serious and to gather specific details. Ms. Harrell said she was serious and proceeded to explain to Mr. Wood how to go about robbing the bank. She told him that she was the vault teller, that the bank cameras did not work, that the ten dollar bills had dye packs, and that the employees had been instructed not to trigger the alarm until after a robbery was finished. She also told him that she did not want to know when a robbery was planned so that she would be able to be surprised. Mr. Wood relayed this information to Mr. Nottingham, who said he knew two people who could do the robbery, Mickey and Jamar. Mr. Wood identified Mickey as codefendant Mr. Johnson, and Jamar as codefendant Mr. Carroll.
 
 
 5
 On the morning of the robbery, Mr. Nottingham arrived at Mr. Wood's house along with Mickey and Jamar. The stop at Mr. Wood's was not planned, and occurred because the stolen automobile defendants intended to use in the robbery had broken down. All three men entered Mr. Wood's bedroom, and Mr. Wood told them to take his brother's black Trans Am to rob the bank.
 
 
 6
 Mr. Nottingham intended to have Mr. Johnson and Mr. Carroll rob the bank while he waited for them in the getaway car. As planned, Mr. Johnson and Mr. Carroll entered the bank during the lunch hour and ordered everyone to lie down. An employee of the bank testified at trial that the robber bypassed the two teller stations and went around the counter and through a door to Ms. Harrell. Mr. Johnson directed Ms. Harrell to the vault drawer and told her to fill up a pillowcase. At one point, Ms. Harrell reached for the dye pack and bait money, but Mr. Johnson hit her hand with the gun and she did not give them to him. Later she hit her hand on the sink in the bathroom to make it look worse. After the money was placed in the bag, both men left the bank in the black Trans Am. There are no photographs of the robbers because the video surveillance equipment in the bank did not work.
 
 
 7
 After the robbery, Mr. Nottingham and Kenneth Thompson, who later testified for the government, arrived at Mr. Wood's girlfriend's apartment with a duffel bag containing approximately $10,000 in denominations of twenties, fives, and ones. The money was counted and $5000 was given to Mr. Wood. Mr. Nottingham told Mr. Wood that Mickey and Jamar had already taken their share. Mr. Wood told Mr. Nottingham that he would give money to Ms. Harrell, but Ms. Harrell never received any. Both Mr. Wood and Mr. Thompson saw two guns, a .38 and a .45, inside Mr. Nottingham's duffel bag containing the money.
 
 
 8
 As noted above, Mr. Wood and Mr. Mook decided to record Mr. Wood's telephone calls. The recording device was placed on Mr. Wood's phone on June 21, 1991, by Mr. Mook's private investigator. Conversations were recorded between Mr. Wood and Mr. Nottingham, and between Mr. Wood and Mr. Carroll. The calls were initiated by either Mr. Nottingham or Mr. Carroll, and all of the recordings were made after these defendants were indicted. The recording device was removed on August 15, 1991. The recordings were transcribed by Mr. Mook's secretary, and eventually were given to the government. In addition, Mr. Wood recorded two conversations with Ms. Harrell before she was charged, one over the phone[4] and the other in a face-to-face conversation where Mr. Wood carried a recording device.
 
 
 9
 Tapes of the recordings were played for the jury and were introduced into evidence. In a conversation between Mr. Nottingham and Mr. Wood, they referred to the "little girl." When asked what "little girl" he was referring to Mr. Wood replied, "Dee Dee Romo [Ms. Harrell]." Rec., vol. XIII, at 469. Mr. Wood also acknowledged referring to Mickey and Jamar during a conversation with Mr. Nottingham. During one conversation, Mr. Wood told Ms. Harrell, "the whole clan's in." Id. at 510. He testified that the "clan" he was referring to was "Charlie and Jamar and Mickey, everybody that had anything to do--that was involved in the bank robbery." Id. Mr. Wood also testified regarding what Mr. Nottingham told him immediately after the robbery:
 
 
 10
 Charlie told me that he was sitting there in his car, in the second car, and when Mickey and Jamar had come around the corner that there was a radar detector on my brother's dash, his car, and it went off, and Charlie said it scared them, and they parked the car and they got out, and they got in Charlie's car, got on the floor, and then Charlie proceeded to take them wherever it was he took them.
 
 
 11
 Id. at 518. Finally, during a taped conversation between Mr. Wood and Mr. Carroll, the latter worried about who might be talking to the authorities and speculated it might be Kenneth Thompson, who had accompanied Mr. Nottingham to Mr. Wood's apartment on the day of the robbery.
 
 
 12
 After the robbery, the government interviewed several persons. During Agent Bill Brown's interview of Ms. Harrell, she said she did not recognize Mr. Wood when she was shown a photograph of him. Agent James Malloy subsequently interviewed Ms. Harrell about the robbery, and she explained to him that she had not recognized the photograph of Mr. Wood previously because she knew Mr. Wood had longer hair. During an interview with Detective Charles Folks of the Tulsa Police Department, Ms. Harrell stated that she had known Mr. Wood for several years. Kenneth Thompson testified that while Mr. Nottingham and Mr. Wood were sorting the money after the robbery, they discussed how "2,500 goes to the girl." Rec., vol. XIV, at 732-33. He also testified that, prior to the robbery, Mr. Nottingham told him about a "job" that Mr. Wood had and that it was an "inside job". Id. at 743.
 
 
 13
 Linda Carroll, Mr. Carroll's wife, admitted that she and two males purchased a 1977 Cutlass Oldsmobile for $1,200 in cash. The owner of the car lot, Brian Jacobs, testified that Ms. Carroll, accompanied by two males, purchased the car with cash, in large denominations, which she retrieved from a brown paper bag. Deputy Marshal Paul Thielen testified that Mr. Johnson's appearance had changed in the week prior to trial. He had cut his hair and told Deputy Marshal Thielen "they won't be able to identify who robbed the bank." Id. at 796-97. Ms. Harrell told Teresa Barber, another employee at the bank, that she believed Mr. Wood was involved in the robbery and that she thought the getaway car belonged to Mr. Wood's brother.
 
 
 14
 Prior to the introduction of the conversations recorded by Mr. Wood, an evidentiary hearing was held to address whether Mr. Nottingham's and Mr. Carroll's Sixth Amendment right to counsel had been violated. Mr. Mook and Mr. Wood both testified. The district court held that while defendants' right to counsel had attached when the conversations were recorded, Mr. Wood was not a government agent and that he had not deliberately elicited incriminating statements.
 
 
 15
 On appeal, defendants make the following claims: the Sixth Amendment right to counsel of Mr. Nottingham and Mr. Carroll was violated by using Mr. Wood as a government agent; a Batson error was committed during jury selection; the court erred in allowing Mr. Wood to testify about the statements made to him by his coconspirator Mr. Nottingham; the court erred in admitting prior hearsay statements of government witness Kenneth Thompson; the evidence was not sufficient to support the convictions of Ms. Harrell, Mr. Carroll, and Mr. Johnson; the court committed plain error by allowing the government to delete the phrase "each armed with handguns," from the superseding indictment; the court erred in imposing an upward adjustment on Ms. Harrell's sentence under U.S.S.G. Sec. 3B1.3 for abusing a position of trust, and on Mr. Nottingham's sentence under U.S.S.G. Sec. 3B1.1(b) for managing or supervising five or more participants; and the court committed plain error by imposing a sentence on Mr. Nottingham and Ms. Harrell in excess of the statutory maximum for conspiracy to rob a bank. We address each in turn.
 
 II.
 
 16
 Mr. Nottingham and Mr. Carroll argue that the tape recordings made by Mr. Wood and introduced at trial violated their Sixth Amendment right to counsel and are therefore inadmissible. Defendants claim that the statements on the tape recording were made after they were indicted, in the absence of counsel, and were deliberately elicited by a government agent. See Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).
 
 
 17
 There is no dispute that defendants' right to counsel had attached at the time the recordings were made. Thereafter, "the prosecutor and police [had] an affirmative obligation not to act in a manner that circumvent[ed] and thereby dilute[d] the protection afforded by the right to counsel." Moulton, 474 U.S. at 171, 106 S.Ct. at 484. "[I]n order to find a violation of a defendant's Sixth Amendment right to counsel, a court must find that defendant's statements (1) were made to a government agent, and (2) were deliberately elicited." United States v. Taylor, 800 F.2d 1012, 1015 (10th Cir.1986), cert. denied, 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987). We review under the clearly erroneous standard with respect to the underlying factual issues but de novo with respect to the ultimate constitutional issue. See United States v. Surridge, 687 F.2d 250, 253 (8th Cir.), cert. denied, 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982):
 
 
 18
 [T]he determination as to the relationship or understanding between the police and the informant is a factual determination. However, beyond this factual determination there is a legal question: whether the relationship or understanding as found by the district court is such that the informant's questioning has to be considered government interrogation for constitutional examination.
 
 
 19
 Id. (footnote omitted).
 
 
 20
 After a hearing at which Mr. Wood and his attorney Mr. Mook testified, the district court found that "the evidence simply does not support that Mr. Wood was acting as the agent of the United States Government at the time of the taping of any of these conversations.... The evidence supports the fact that no promise or benefit had been made to him.... Further, the Court concludes from a reading of these transcripts ... that each of those telephone calls was initiated by either Mr. Carroll ... or Mr. Nottingham ... they were not initiated by Mr. Wood." Rec., vol. XII, at 227-28. The court concluded that "there was no violation of the Sixth Amendment right to counsel." Id. at 228.
 
 
 21
 Although defendants acknowledge that the government did not explicitly authorize Mr. Wood's recordings, they argue that an implicit agreement existed between the government and Mr. Wood under which Mr. Wood would receive a benefit for his cooperation. An agreement with the government need not be express in order to support a finding that an informant is a government agent. Taylor, 800 F.2d at 1016; see United States v. York, 933 F.2d 1343, 1357 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991); Surridge, 687 F.2d at 254. If an informant subsequently receives a benefit, it may be evidence that a prior agreement did exist. York, 933 F.2d at 1358. Mr. Wood received a reduced sentence to one count of conspiracy to rob a bank.[5]
 
 
 22
 Defendants assert that Mr. Wood's intention, from the beginning, was to enter into a plea agreement with the government. They claim that from Mr. Mook's first contact with the government, the government implied it would help Mr. Wood if he gave assistance. Thus, defendants argue, Mr. Wood and the government entered into an implicit agreement creating the necessary agency relationship in violation of defendants' Sixth Amendment right to counsel.
 
 
 23
 The record reflects that Mr. Mook approached the government on June 17 or 18 immediately after Mr. Wood was arrested. He informed an Assistant United States Attorney of Mr. Wood's willingness to cooperate, but made no mention of any intention on the part of Mr. Wood to tape conversations with his codefendants. The government attorney did not promise Mr. Mook that Mr. Wood would receive any benefit for his cooperation, although as related by Mr. Mook, the government attorney, did say "that we would proceed and see what my client could do. That indicates, implicit in that statement is that if he does something, I'm going to try to help him. That was not said, though. He understood I was there to help my client." Rec., vol. XII, at 209. After Mr. Mook decided to have Mr. Wood tape any calls he received from his codefendants, Mr. Mook told an FBI agent about the intended taping and was advised to call the U.S. Attorney's Office. He then telephoned another Assistant United States Attorney, Ms. Pennington, and told her what he intended to do. Mr. Mook described that conversation as follows:
 
 
 24
 Well, there was not a lot to discuss. I simply told her--she asked me why I was calling. It kind of confused her, I think. I'm assuming that. She said, "Why are you telling me this?" And I said, "I simply want you to know what I am doing."
 
 
 25
 I discussed, I believe, with her at that time the accuracy of the indictment and told her that I thought somebody else was talking, and I didn't want my client to have unmonitored conversations with anybody involved in the indictment. And I told her when the recordings were made, I'd make them available to the government, and she said words to the effect, "I don't know whether I could use them." But she didn't authorize it, I didn't seek authority from her. I told her what I was going to do.
 
 
 26
 I think from my experience, when you're working with the United--especially with the United States Government--anything you intend to do with a cooperating defendant should be made part of the record so it's not misconstrued or misinterpreted.
 
 
 27
 Q. Did Ms. Pennington give you any instructions at all with respect to what was to be said or not said by Mr. Wood in those conversations?
 
 
 28
 A. No. Her part of the conversation was nonplussed, mostly negative, just--I don't know why--but I got the feeling she couldn't understand why I thought I had to tell her this. I tried to explain to her. I think she finally understood that I was simply making a record on what I was doing.
 
 
 29
 Id. at 217-18.
 
 
 30
 The recording device was placed on Mr. Wood's telephone by Mr. Mook's private agent. The government was not involved in the decision to record and did not instruct Mr. Wood on how to handle the recording. When Mr. Wood first met with the government on June 24 to tell his story, he did not mention the taping, nor was he asked about it. Mr. Mook turned the tapes over to the government in late September or early October when it was clear the case was going to trial. Mr. Wood was not paid by the government, and no explicit plea agreement between the government and Mr. Wood existed until after the telephone recordings were made and the case was set for trial. Mr. Wood certainly hoped that he would receive a benefit for his cooperation, but he testified he understood that the government did not promise him a reward in exchange for his cooperation. It is clear Mr. Mook was doing what he thought would be best for his client, and that Mr. Wood hoped he would receive a benefit in exchange for his cooperation.
 
 
 31
 In making its determination on this issue, the district court relied on our decision in Taylor, 800 F.2d 1012. Taylor had encountered the informant, a former co-employee, at the jail and said he needed an alibi because he was charged with bank robbery. The informant told the FBI, and Taylor was thereafter placed in the informant's cell. Taylor made incriminating statements to the informant, who then testified at Taylor's trial. The informant admitted that he hoped to gain a benefit as a result of his cooperation, but that he had not received a promise of a benefit from the government. We held that the informant was not a government agent, and that any benefits he hoped to gain were "mere expectancies." Id. at 1015, 1016. We declined "to infer an agreement between the Government and [the informant] merely from the placement of Taylor in [the informant's] cell. In the absence of any express or implied quid pro quo underlying the relationship between [the informant] and the Government, and in the absence of any instructions or directions by the Government, we [held] that [the informant] was not a Government agent." Id. at 1016 (citations omitted). The government's involvement in Taylor was plainly greater than in the present case.
 
 
 32
 Taylor relied on United States v. Calder, 641 F.2d 76 (2d Cir.), cert. denied, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981), in which the court held that an informant who was the defendant's cellmate was not a government agent. The attorney for the informant had discussed with the government the possibility of his client cooperating, but no agreement was reached until after the defendant had uttered the incriminating statements. Id. at 78. By contrast, in United States v. Geittmann, 733 F.2d 1419 (10th Cir.1984), we held that Geittman's right to counsel was violated by a codefendant who made tape recordings as part of an agreement to cooperate with the government. Significantly, in Geittmann, "the government agents led [the government informant] to believe that his cooperation in the investigation would be to his advantage." Id. at 1427. The government in the present case studiously refrained from making any such representations, and Mr. Wood acted on instructions of his attorney rather than the government.
 
 
 33
 Mr. Wood and Mr. Mook made their decision to approach the government, in part, because of the detail contained in the indictment concerning the robbery. Mr. Mook testified that:
 
 
 34
 the indictment that came down was so specific and covered such fine points in the criminal transaction that I advised my client at that time that someone was talking, and I asked him to level with me and tell me whether the facts as they appeared in the indictment were correct. He confirmed the correctness of [the facts] in the first ... indictment[ ].... I advised him that if he was involved that he should give me immediate permission to inform the government that he was willing to cooperate.
 
 
 35
 Rec., vol. XII, at 214. The apparent knowledge the government already had supports the inference that it would be reluctant to immediately make a deal with Mr. Wood. The government could have reasonably felt confident about the case, based on its own investigation, so that the cooperation of a codefendant was not an urgent consideration.
 
 
 36
 Under these circumstances, we are not persuaded the district court erred in concluding that Mr. Wood was not a government agent. The government consistently responded that it was not offering a benefit for Mr. Wood's cooperation, and it did not assist Mr. Wood in his actions. The government did not initiate the contact, did not advise or instruct Mr. Wood, and did not play a role in the tape recording of the defendants' phone calls. The government thereby remained true to the dictates of Moulton that the police have "an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." 474 U.S. at 171, 106 S.Ct. at 484. Of course, Mr. Wood and his attorney hoped that a benefit would be forthcoming. However, we decline to handicap legitimate investigations by assuming that any time the government is approached by a would-be informant and eventually uses evidence obtained by that informant, an implicit agency relationship is established.
 
 
 37
 To do so would be in practical effect to establish the principle that any voluntary proffer of ... informer assistance not met with silence or actually repudiated by state officials would make inadmissible any inculpatory disclosures ... that are subsequently made by an accused in conversations with the [informer].
 
 
 38
 Thomas v. Cox, 708 F.2d 132, 136 (4th Cir.), cert. denied, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).[6]
 
 III.
 
 39
 Ms. Harrell claims that a Batson error was committed during jury selection when the prosecutor used peremptory challenges to strike two black venirepersons. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). She alleges that the prosecutor's explanation for striking the potential jurors was not race neutral. A race neutral explanation is one that is based upon some reason other than the race of the venireperson. See Hernandez v. New York, --- U.S. ----, ----, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id. If we determine that the prosecutor's explanations for striking the venirepersons were facially race neutral as a matter of law, we then review under the clearly erroneous standard the district court's ruling that the prosecutor did not intend to discriminate. United States v. Johnson, 941 F.2d 1102, 1108 (10th Cir.1991).
 
 
 40
 The prosecutor offered explanations for each challenge to the two black venirepersons. One challenge was made because the prosecutor believed the person "was inattentive to the Court's questions.... [W]e don't believe that she is going to be able to pay attention to the evidence." Rec., vol. X, at 58. The other person, a schoolteacher, was struck because the prosecutor's "experience with jurors who are schoolteachers has not been favorable.... we just don't believe they make good jurors." Id. at 61. The district court ruled that neither of the prosecutor's explanations was based on the race of the venireperson.
 
 
 41
 The prosecutor's statement that one prospective juror was inattentive and might not pay attention to the evidence is facially a race neutral explanation. Other circuits have recognized the propriety of striking a juror who was inattentive during voir dire. United States v. Todd, 963 F.2d 207, 211 (8th Cir.1992) (inattentiveness is race neutral); Moore v. Keller Ind., Inc., 948 F.2d 199, 202 (5th Cir.1991) (same), cert. denied, --- U.S. ----, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992); United States v. Sherrills, 929 F.2d 393, 395 (8th Cir.1990) (same); United States v. Roberts, 913 F.2d 211, 214 (5th Cir.1990) (same), cert. denied sub. nom., --- U.S. ----, 111 S.Ct. 2264, 114 L.Ed.2d 716 (1991); United States v. Lance, 853 F.2d 1177, 1181 (5th Cir.1988) (same); see also Barfield v. Orange County, 911 F.2d 644, 648 (11th Cir.1990) (hostile facial expressions and body language are race neutral), cert. denied, --- U.S. ----, 111 S.Ct. 2263, 114 L.Ed.2d 715 (1991). The court in Sherrills addressed the subjective nature of determining "inattentiveness." "Determining who is and is not attentive requires subjective judgments that are particularly susceptible to the kind of abuse prohibited by Batson." 929 F.2d at 395. We agree that "a prosecutor's explanation of challenges on the grounds of inattentiveness deserves careful scrutiny by the district court, and special care by counsel to fully develop the record concerning the specific behavior by venire members motivating counsel to make a peremptory challenge based on inattentiveness." Id. We are satisfied here that the district court carefully scrutinized the prosecutor's explanations for striking the two venirepersons and that the record fully supports the challenges.
 
 
 42
 Ms. Harrell asserts here that the prosecutor's explanation was rebutted by the defense observation that the person was attentive. In ruling, the district court stated: "I could see based on the responses of [the venireperson] and her appearance during the voir dire [the prosecution] may not desire to have her as a juror for some reason other than race." Rec., vol. X, at 59. The district court is in the "best position to observe the demeanor and credibility" of the prosecutor and the witness. Johnson, 941 F.2d at 1109. The court believed the prosecutor's explanation, and that ruling is not clearly erroneous.
 
 
 43
 The prosecutor's explanation for striking the teacher is also facially race neutral. Ms. Harrell contends, however, that the prosecutor's explanation "is not legitimate and has no factual basis." Aplt. Br. at 18. In sustaining the challenge to the teacher, the court stated: "I assume [the prosecutor] has a right to conclude" that schoolteachers do not make good jurors. Rec., vol. X, at 61. The court ruled, "I don't conclude that [the prosecutor is] making that conclusion because of the juror's race." Id. The court's finding that the prosecutor was not racially motivated is supported by the fact that she did not strike a third black woman who served as the foreperson of the jury. The presence of members of the subject race on the final jury is a relevant factor in negating an alleged Batson violation when the government has the opportunity to strike the juror. United States v. Esparsen, 930 F.2d 1461, 1468 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). Conversely, if the government had used a peremptory strike to remove this juror, a prima facie case of discrimination would have arisen. United States v. Chalan, 812 F.2d 1302, 1313-14 (10th Cir.1987) (using peremptory challenges to strike last remaining juror of defendant's race raises inference of discrimination). We therefore hold that there was no Batson error.
 
 IV.
 
 44
 Mr. Carroll and Mr. Johnson argue that Mr. Wood's testimony regarding statements made by Mr. Nottingham should not have been admitted by the district court. They objected among other things to Mr. Wood's testimony that Mr. Nottingham on more than one occasion identified Mickey and Jamar as the two individuals he had recruited to rob the bank, and told Mr. Wood that they had in fact robbed the bank and had taken their share of the money. Defendants argue that the statements constitute hearsay that is not admissible under the coconspirator hearsay exception set out in Federal Rule of Evidence 801(d)(2)(E). Defendants maintain that the jury could not have found them guilty without these hearsay statements.
 
 
 45
 "Coconspirator hearsay evidence is properly admitted under Fed.R.Evid. 801(d)(2)(E) if the trial court determines that: (1) a conspiracy is proven by a preponderance of the evidence; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made in the course and furtherance of the conspiracy." United States v. Powell, 982 F.2d 1422, 1432 (10th Cir.1992) (citing United States v. Johnson, 911 F.2d 1394, 1403 (10th Cir.1990)), cert. denied, --- U.S. ----, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993). We review the district court's findings that the statements were made during the course of and in the furtherance of the conspiracy under the clearly erroneous standard. United States v. Perez, 989 F.2d 1574, 1580 (10th Cir.1993) (en banc) (citing Bourjaily v. United States, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987)); United States v. Caro, 965 F.2d 1548, 1557 (10th Cir.1992). We review the district court's ultimate evidentiary ruling under Fed.R.Evid. 801(d)(2)(E) for abuse of discretion. Id.
 
 
 46
 Mr. Wood testified that Mr. Nottingham said he had recruited Mr. Carroll and Mr. Johnson to carry out the bank robbery. Mr. Carroll and Mr. Johnson arrived at and entered Mr. Wood's house on the day of the robbery. Mr. Wood permitted them to take his brother's car when they said the car they had stolen for the robbery had broken down. This testimony led the trial court to find as follows:
 
 
 47
 It would appear to me, based upon the evidence that I've heard in this case coupled with Mr. Wood's testimony so far, that there is evidence, at least evidence sufficient for an inference to be established, that there is a conspiracy in reference to this Cimarron Savings and Loan Association matter, and that now with the presence of these gentlemen in Mr. Wood's room, that is Nottingham, Johnson and Carroll, it would appear that they along with Dee Dee Romo, along with Mr. Wood here, are parties to the conspiracy and that the discussions that are taking place at this time are, the Court concludes, are pursuant to the furtherance of the conspiracy.
 
 
 48
 Rec., vol. XII, at 411. The district court thus made the determination that there was a conspiracy, that Mr. Wood, Mr. Nottingham, Mr. Johnson, Mr. Carroll, and Ms. Harrell were members of the conspiracy, and that the testimony concerned conversations in furtherance of the conspiracy.
 
 
 49
 Defendants argue that the incriminating statements were not made in furtherance of the conspiracy but were instead merely a narrative. We disagree. Mr. Nottingham's statements about Mr. Carroll and Mr. Johnson were "intended to promote conspiratorial objectives." Perez, 989 F.2d at 1578. After reviewing the record, we are convinced that the district court's Rule 801(d)(2)(E) findings are not clearly erroneous and that the court did not abuse its discretion in admitting the hearsay statements.V.
 
 
 50
 Mr. Nottingham complains that the district court erred in admitting into evidence prior hearsay statements of Kenneth Thompson. During his direct examination, Mr. Thompson was unable to recall certain events. Because he had previously given a statement to the police about the events, the prosecutor read from the statement in an attempt to refresh Mr. Thompson's memory. We review for abuse of discretion the district court's admission of evidence over this hearsay objection. Doty v. Elias, 733 F.2d 720, 725 (10th Cir.1984).
 
 
 51
 Mr. Nottingham claims that Mr. Thompson's memory was not properly refreshed, and that the government improperly used the prior statements as substantive evidence. Mr. Thompson acknowledged that he had given a statement and that he recalled making a specific statement incriminating Mr. Nottingham. The prosecutor did not specifically ask Mr. Thompson if his memory was refreshed or if his present testimony was consistent with the prior statements. Reviewing the record as a whole, however, it is clear that the court, in response to a defense objection, recognized that the prosecutor was attempting to refresh Mr. Thompson's memory. See rec., vol. XIV, at 727-28; see also Doty, 733 F.2d at 725. Mr. Thompson was cross-examined concerning his memory about the past events, and he stated "I do know what happened today." Rec., vol. XIV, at 752 (referring to his present testimony). The district court did not abuse its discretion in permitting Mr. Thompson's prior statements to be used to refresh his memory, thus enabling him to testify from his present memory.
 
 VI.
 
 52
 Ms. Harrell, Mr. Johnson, and Mr. Carroll claim that the evidence was insufficient to support their conspiracy and bank robbery convictions. Mr. Johnson and Mr. Carroll also contend that the evidence was insufficient to support the charge of possessing a firearm. "Evidence is sufficient if a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Thody, 978 F.2d 625, 630 (10th Cir.1992). We view the evidence supporting a conviction in a light most favorable to the government. Id.
 
 
 53
 No one at the bank who witnessed the robbery was able to identify either Mr. Johnson or Mr. Carroll, probably because the robbers wore masks. Nor was there any fingerprint identification. Nevertheless, after examining the evidence, we conclude that it was sufficient to support their convictions as well as that of Ms. Harrell. Mr. Wood's testimony established that Ms. Harrell suggested the idea of robbing the bank and provided the details as the "inside" person. Mr. Johnson and Mr. Carroll were recruited by Mr. Nottingham and arrived at Mr. Wood's apartment the day of the robbery to obtain a car to use during the robbery. The testimony at trial also revealed information about the associations these defendants had with each other and about their connection to the robbery itself. The evidence set out here and in section I, supra, sufficiently supports defendants' convictions for conspiracy and bank robbery.
 
 
 54
 The convictions of Mr. Johnson and Mr. Carroll for possession of a firearm are also supported by sufficient evidence. The evidence shows that Mr. Johnson used a gun during the robbery and that two guns were found in the bag with the stolen money after the robbery. The jury was correctly instructed that "possession" may be constructive, and that a defendant need not display the weapon. The evidence was sufficient to support the jury's conclusion that Mr. Johnson and Mr. Carroll possessed a firearm during the bank robbery.
 
 VII.
 
 55
 Mr. Johnson contends the district court erred in allowing the government to delete, as surplusage, the phrase "each armed with handguns" from the superseding indictment. The original superseding indictment alleged in the overt acts section of the conspiracy count that "defendants Carroll and Johnson entered the Cimarron Savings & Loan ... each armed with handguns, and robbed the Cimarron Savings & Loan at gunpoint." Rec., vol. I, doc. 15 at 3-4. The court held that the phrase to be deleted, "each armed with handguns," was unnecessary to the charge of conspiracy to rob a bank. Rec., vol. I, doc. 29 at 2. Significantly, the court also noted that "only one Defendant, Robert Johnson, has raised this issue before and the Government states Johnson does not object to the Government's Motion to strike the phrase 'each armed with handguns.' " Id.
 
 
 56
 We conclude that the court was not in error in deleting the phrase from the superseding indictment because the phrase is unnecessary to the conspiracy charge in the indictment. It makes no difference whether Mr. Carroll and Mr. Johnson were each armed with a handgun or if only one of them possessed the handgun, because the other was still charged with aiding and abetting the armed robbery and was part of the conspiracy if he participated. See 18 U.S.C. Sec. 371, 18 U.S.C. Sec. 2113(a) and (d), 18 U.S.C. Sec. 2 (1988). Moreover, it appears from the record that Mr. Johnson raised the issue and then waived any objection to the government's motion to strike.
 
 VIII.
 
 57
 Ms. Harrell claims that the trial court erred in imposing a two level upward adjustment on her sentence for abusing a position of trust. U.S.S.G. Sec. 3B1.3. She argues that her status at the bank was no more than an "ordinary bank teller," and that she did not significantly facilitate the robbery.
 
 
 58
 Section 3B1.3 states "if the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." See United States v. Brelsford, 982 F.2d 269, 271 (8th Cir.1992). "In determining whether a defendant was in a 'position of trust' courts have considered a number of factors [including] defendant's duties as compared to those of other employees; defendant's level of specialized knowledge; [and] defendant's level of authority in the position." United States v. Williams, 966 F.2d 555, 557 (10th Cir.1992) (footnotes omitted). "Abuse of a position of trust is a 'sophisticated factual determination that will be affirmed unless clearly erroneous.' " Id. (citation omitted); see United States v. Chimal, 976 F.2d 608, 613 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1331, 122 L.Ed.2d 715 (1993).
 
 
 59
 The first question is whether Ms. Harrell's position was similar to an "ordinary bank teller" and thereby not subject to the increase. U.S.S.G. Sec. 3B1.3, comment. (n. 1). In essence, Ms. Harrell argues that her functions as vault teller were similar to the functions of the other tellers at the bank, and to the extent she had the opportunity to invite a bank robbery, the opportunity was present for the other tellers as well. However, "uniqueness of the job is not relevant for determining whether an employee holds a position of trust." Brelsford, 982 F.2d at 272. The inquiry is more complex than mere categorization of positions. The guidelines look not only to the position of the defendant, but also to the acts committed to determine whether this defendant is "more culpable" than others. U.S.S.G. Sec. 3B1.3, comment. (backg'd). "The guideline application note to section 3B1.3 uses [an embezzlement by an] ordinary bank teller as an example of a position that does not involve a sufficient degree of trust to justify an adjustment of the offense level." Brelsford, 982 F.2d at 272. "Banks do not generally vest a great amount of unfettered responsibility in their ordinary tellers." Id.
 
 
 60
 Ms. Harrell was not an ordinary teller, she was a vault teller. She had been an ordinary teller at three different banks before joining Cimarron Federal Savings and Loan Association. At the institution where Ms. Harrell worked just prior to working at Cimarron, she was trained and then promoted to vault teller. She began at Cimarron as a teller and was eventually trained and then promoted to vault teller. As vault teller, Ms. Harrell was responsible for ordering weekly shipments of cash. She was responsible for receiving the delivery of the cash directly from the armored car personnel, and it was her responsibility to count and verify each cash delivery. Moreover, she carried the key to the vault. In short, the bank entrusted her with responsibilities beyond those of the other tellers. We conclude that Ms. Harrell's position as vault teller was a position of trust.
 
 
 61
 The evidence clearly shows that Ms. Harrell used her position in a manner that significantly facilitated the commission or concealment of the crime. She was the initiator of the robbery, she instructed others on how to rob her bank and on how to avoid detection, and, significantly, she was in charge of the vault and handed the money to the robber. Her advice to defendants concerning the inside operations of the bank was designed to aid in the commission and concealment of the crime. Ms. Harrell's actions significantly facilitated the robbery and constituted an abuse of her position as vault teller. We conclude that the trial court did not err in increasing Ms. Harrell's guideline range by two levels for abusing her position of trust. See United States v. Fox, 999 F.2d 483, 486-487 (10th Cir.1993).
 
 IX.
 
 62
 Mr. Nottingham complains that the trial court erred in imposing an upward adjustment on his sentence for managing or supervising five or more participants. U.S.S.G. Sec. 3B1.1(b). Because no objection was made below, our review is for plain error. United States v. Saucedo, 950 F.2d 1508, 1511 (10th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 1343, 122 L.Ed.2d 725 (1993); Fed.R.Crim.P. 52(b).
 
 
 63
 Section 3B1.1(b) provides for an increase if the defendant was a "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." Mr. Nottingham argues that he cannot be subject to the increase under section 3B1.1(b) because he did not manage at least five participants. He contends that he only managed Mr. Carroll and Mr. Johnson, but did not exercise control over Mr. Wood or Ms. Harrell. He supports his contention by relying on two Tenth Circuit cases interpreting section 3B1.1(a), which concerns "an organizer or leader of a criminal activity" involving five or more persons. He cites United States v. Reid, 911 F.2d 1456, 1464-65 & n. 8 (10th Cir.1990), cert. denied, 498 U.S. 1097, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991), for the proposition that under section 3B1.1(a) the defendant himself must have exercised control over at least five participants. Aplt.Br. at 46. See also United States v. Smith, 951 F.2d 1164, 1170 (10th Cir.1991) (under section 3B1.1(a), "the government must show that each member of the organization is answerable to the defendants and is under his continuing control.") Although both sections 3B1.1(a) and (b) enhance a defendant's sentence based on the defendant's role in the offense, they differ in the magnitude of the role a defendant assumes in a criminal activity. We have not addressed whether a defendant under section 3B1.1(b) must control, directly or indirectly, at least five participants.
 
 
 64
 The Seventh Circuit considered this issue in United States v. McGuire, 957 F.2d 310 (7th Cir.1992). Although the evidence showed that the defendant in McGuire controlled only three participants, the court nonetheless held that an increase under section 3B1.1(b) was proper because section 3B1.1(b) "does not require actual control over the 'five or more participants'." Id. at 316. To meet the requirements of section 3B1.1(b), there must be evidence that a defendant was a manager or supervisor " 'and the criminal activity involved five or more participants'--not that a defendant managed, or controlled, the five or more participants." Id. "[T]here is no requirement in Sec. 3B1.1(b) that a defendant control the activities of all the participants in the criminal activity." Id. at 316-17. The McGuire court distinguished our Reid case because Reid interprets section 3B1.1(a). Under section 3B1.1(a) "to lead an organization you must control its members. But to be a manager in an organization ... [under] Sec. 3B1.1(b), you need not control all of its members." McGuire, 957 F.2d at 317, n. 4.
 
 
 65
 Other circuits have interpreted section 3B1.1(b) similarly. The Ninth Circuit held "there is no requirement ... that the defendant exercise authority over at least five participants before the enhancement can be applied. Instead, 'in order for a defendant to receive an adjustment under Sec. 3B1.1(b) for his role as a manager or supervisor, the defendant must have managed or supervised at least one other participant.' " United States v. Barnes, 993 F.2d 680, 685 (9th Cir.1993) (quoting United States v. Helmy, 951 F.2d 988, 997 (9th Cir.1991)). Likewise, in United States v. Savoie, 985 F.2d 612 (1st Cir.1993), the First Circuit upheld a determination that the defendant was a manager or supervisor under section 3B1.1(b). "Managerial status may attach if there is evidence that a defendant, in committing the crime, exercised control over, or was otherwise responsible for overseeing the activities of, at least one other person." Id. at 616. See also United States v. Adipietro, 983 F.2d 1468, 1472-73 (8th Cir.1993). Each of these circuits has concluded that section 3B1.1(b) does not require that a defendant manage or supervise at least five participants. We join that conclusion.
 
 
 66
 It is undisputed that Mr. Nottingham managed Mr. Johnson and Mr. Carroll, see Aplt.Br. at 47, and that there were five or more participants in this criminal activity, thus meeting the requirements of section 3B1.1(b). The district court did not err in imposing an upward adjustment on Mr. Nottingham for managing or supervising five or more participants.
 
 X.
 
 67
 Finally, Mr. Nottingham and Ms. Harrell contend that it was plain error for the court to impose a sentence in excess of the statutory maximum penalty for their conspiracy convictions on count one. The statutory maximum penalty for a violation of 18 U.S.C. Sec. 371 is 60 months. Mr. Nottingham was sentenced to 156 months[7] and Ms. Harrell was sentenced to 70 months. The imposition of these sentences in excess of the statutory maximum constitutes plain error. See Saucedo, 950 F.2d at 1516-17. We therefore reverse the sentences imposed on Mr. Nottingham and Ms. Harrell for their conspiracy convictions and remand for resentencing on that count only.
 
 XI.
 
 68
 In summary, defendants' convictions and sentences are AFFIRMED, except that Mr. Nottingham's and Ms. Harrell's sentences in excess of the maximum of 60 months for their conspiracy convictions are REVERSED and the case is REMANDED for resentencing of those defendants on count one only.
 
 McKAY, Chief Judge, concurring:
 
 69
 I concur in the judgment and most of the opinion of the court. My sole reservation stems from the fact that I still believe United States v. Taylor, 800 F.2d 1012 (10th Cir.1986) (McKay, J., dissenting), was wrongly decided. If that case were not the law of this circuit, I believe the facts of this case would raise a serious question of whether (as in many other legal contexts such as conspiracy, price fixing, etc.) there was an agreement implied in fact for one defendant aided by counsel to act as agent of the government with a quid pro quo implied in fact. That of course would be a fact to be decided by the trial court based on all the facts and circumstances together with the reasonable inferences to be drawn therefrom. Agency is not a novel principle. In this context, it is the test of government overreaching. It would not stretch to any degree existing agency cases in a host of contexts, including conspiracy contexts, for a trier of fact to find agency in this case.
 
 
 
 *
 No. 92-5008, United States v. Johnson, was submitted on the briefs
 
 
 **
 The Honorable John C. Godbold, Senior United States Circuit Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation
 
 
 [1]
 Dee Dee Romo will be referred to as Deidre Harrell. Ms. Harrell was married during the course of the proceedings and through counsel has indicated she prefers to be recognized as Deidre Harrell
 
 
 [2]
 Defendants argued their cases individually and appealed individually. We consolidated the appeals for the purpose of this opinion
 
 
 [3]
 Mr. Nottingham was sentenced to 156 months imprisonment plus 5 years supervised release and ordered to pay restitution of $12,950. Ms. Harrell was sentenced to 70 months imprisonment plus 3 years supervised release. Mr. Johnson was sentenced to 180 months plus 5 years supervised release and ordered to pay restitution of $7000. Mr. Carroll was sentenced to 180 months imprisonment plus 5 years supervised release and ordered to pay restitution of $7000
 
 
 [4]
 Mr. Wood phoned Ms. Harrell from an FBI telephone
 
 
 [5]
 The government dropped the bank robbery charge against Mr. Wood when he pled guilty to conspiracy to commit bank robbery, which carried a maximum term of imprisonment of five years. The government also agreed to apprise the court of Mr. Wood's cooperation, although it declined to make a motion under U.S.S.G. Sec. 5K1.1 asking the court to depart downward because of the defendant's substantial assistance. The sentencing court nevertheless departed downward from the guideline range, sentencing Mr. Wood to one year and one day in prison
 
 
 [6]
 Given our holding that Mr. Wood is not a government agent, we need not address whether he deliberately elicited incriminating statements
 
 
 [7]
 The court also imposed on Mr. Nottingham a term of supervised release in excess of the maximum term for conspiracy. The maximum term is three years and the court imposed a term of five years. Our resolution of the sentence also applies to the supervised release imposed