**UNITED STATES COURT OF APPEALS**
**Filed 3/6/96**
**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

        v.

JEFFREY DETTLOFF, also known as
John Dettloff,

        Defendant - Appellant.

No. 95-1128

D. Colorado

(D.C. No. 94-CR-74-N)

**ORDER AND JUDGMENT**[*]

Before **ANDERSON, BARRETT,** and **LOGAN**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal.  See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9.  This cause is therefore ordered submitted without oral argument.

Jeffrey Dettloff appeals the district court's decision to adjust his offense level upward under §3B1.1(b) of the Sentencing Guidelines for his aggravating role in a counterfeit check cashing scheme.  Dettloff argues that the district court erred in finding

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the 10th Cir. R. 36.3.

he was a manager or supervisor in criminal activity that involved five or more participants or that was otherwise extensive. We affirm.

**BACKGROUND**

On November 3, 1994, a federal jury in the District of Colorado found Jeffrey Dettloff guilty of one count of conspiracy, nine counts of bank fraud and aiding and abetting, and twelve counts of counterfeit check fraud and aiding and abetting. The convictions stemmed from Dettloff's involvement in a counterfeit check cashing scheme originating in Southern California. The second superseding indictment on which he was tried charged that Dettloff, along with Vu Bui, Jerry O'Neal, and Leyondo Watson, possessed and uttered counterfeit securities at banks in the Denver, Colorado, area with intent to defraud. Dettloff does not appeal his convictions.

Evidence at trial established that Dettloff, Bui, O'Neal, and Watson flew from Los Angeles to Denver with the sole purpose of cashing counterfeit payroll checks. R. Vol. 8 at 9-11. Dettloff and O'Neal traveled together, with Dettloff controlling their airline tickets. Id. at 10-11. Once in Colorado, the conspirators rented a car and drove to the Department of Motor Vehicles to obtain Colorado identification for O'Neal and Watson using fictitious residence addresses. Id. at 11-13. They then drove to various banks in the Denver metropolitan area to cash counterfeit checks. Id. at 14.

At the banks, O'Neal and Watson acted as "facemen" -- the parties who actually entered and cashed the checks. R. Vol. 7 at 104; R. Vol. 8 at 14-15, 22. Dettloff and Bui were "drivers" -- they obtained and drove the cars, held and distributed the checks, collected the proceeds, and divided up the profits. R. Vol. 7 at 104-05; R. Vol. 8 at 14, 19-23, 37. The drivers "call[ed] the shots" and were in "command of the trip." R. Vol. 8 at 37. The conspirators worked in teams, even when they traveled together. Id. at 51. Dettloff disbursed the checks to and collected the money from O'Neal; Bui did the same with Watson. Id. at 50-51. At the end of the day, Dettloff paid O'Neal a percentage of the proceeds. Id. at 48-49.

After two days of cashing counterfeit checks, the conspirators rented a second car. R. Vol. 7 at 84-85. Dettloff drove O'Neal in this car with the intent of cashing additional checks. R. Vol. 8 at 25-26. Before reaching the first bank, Dettloff noticed they were being followed. Id. at 26. Dettloff was able to elude the trailing car, which was in fact a Secret Service vehicle, and stopped to page Bui to warn him about the surveillance. Id. at 27-29. During this time, Dettloff handed an envelope full of counterfeit checks to O'Neal and ordered him to destroy the checks. Id. at 30.

After Dettloff evaded the Secret Service, he and O'Neal checked into a new hotel. Id. at 31. Dettloff telephoned California for a new plan. Id. Shortly afterward, Dettloff left and O'Neal answered a telephone call from a party who indicated that airline reservations had been made for Dettloff and O'Neal to return to California. Id. at 32.

Dettloff's ticket had already been paid for; O'Neal's had not. Id. at 33. When Dettloff returned to the hotel, he telephoned California. Id. at 34. The two then flew back to California. Id. at 35-36. Dettloff was subsequently arrested in Boise, Idaho, on a similar counterfeit check cashing trip. R. Vol. 5 at 10, 17-18.[1]

Additional facts submitted in the Presentence Report and adopted by the district court further elucidated Dettloff's role in the underlying counterfeiting scheme. See Mem. of Sentencing H'rg and Report of Statement of Reasons at 3 ¶ 9, R. Supp. Vol. 1. The uncontested facts showed that a Vietnamese organized-crime operation ran the scheme from Southern California. Presentence Investigation and Report at 2, R. Supp. Vol. 1. The organization paid individuals for the use of their legitimate paychecks for 24 hours. Id. The checks were then duplicated using a sophisticated process that produced a high quality counterfeit. Id. Dettloff then used a typewriter to type his faceman's name on the checks. Id. The printer of the checks and those in the higher echelons of the organization received fifty-five percent of the proceeds from the checks; the drivers and facemen split the remaining forty-five percent. Id. at 3. The low level facemen were recruited specifically to pass the checks, thereby insulating the higher echelon of the organization from direct contact with the banks. Id.

---

[1]Bui and Watson were arrested in Denver by Secret Service agents. R. Vol. 7 at 35-36.

The uncontested facts further showed that, in addition to the Denver trip, Dettloff was involved in the scheme on trips to Salt Lake City, Utah, and Boise, Idaho. Id. at 4-7. The parties agree that the total loss to financial institutions from these three trips was no less than $75,482.13. See Mem. of Sentencing Hr'g and Report of Statement of Reasons at 2 ¶ 5, R. Supp. Vol. 1.

Based on the evidence at trial and the supporting facts in the Presentence Report, the district court determined that Dettloff had played an aggravating role in the offense. The court found Dettloff's role as a driver qualified him as a "manager or supervisor" under USSG §3B1.1(b). The court found no need to decide whether there were five or more "participants" involved in the criminal activity because it determined that such activity was "otherwise extensive" under the same provision. Consequently, the court adjusted Dettloff's offense level upward three levels pursuant to §3B1.1(b). Dettloff's adjusted offense level of 17, combined with his criminal history category of 1, put his sentencing range at 24 to 30 months imprisonment. The court then sentenced him to 27 months in prison and 3 years supervised release. See R. Vol. 9 at 12-14. He appeals.

**ANALYSIS**

We review the district court's findings under §3B1.1 for clear error. United States v. Bernaugh, 969 F.2d 858, 862 (10th Cir. 1992). Upward adjustments of the offense

level must be supported by a preponderance of the evidence. United States v. Pelliere, 57 F.3d 936, 938 (10th Cir. 1995).

The relevant sentencing guideline provides for a three-level increase "[i]f the defendant was a manager or a supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive." USSG §3B1.1(b).

> To qualify for an adjustment under this section, the defendant must have been the . . . manager[] or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not . . . manage[] or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

Id. comment. (n.2); see also United States v. Johnson, 4 F.3d 904, 917-18 (10th Cir. 1993) (government only required to show that defendant was responsible for managing or supervising one of the criminal participants), cert. denied, 114 S. Ct. 1081 (1994).

The evidence supports the finding that Dettloff managed or supervised O'Neal, as well as exercised management responsibility over property, assets, and activities, on the Denver trip. He controlled O'Neal's airline ticket, drove O'Neal in the rented car, typed his faceman's name on the counterfeit checks, held and distributed the checks, collected the money from O'Neal, and gave O'Neal his share of the proceeds. He ordered O'Neal to destroy checks when being pursued by the Secret Service, and he communicated with contacts in California regarding a revision in their plans. In short, he "called the shots." We cannot say that the district court's finding on Dettloff's supervisory role was clearly erroneous.

The Guidelines next address how to determine the extent of the criminal activity. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." USSG §3B1.1 comment. (n.3). Furthermore, the sentencing court may "consider the underlying scheme, as opposed to merely the offense of conviction, in determining role in the offense adjustments." United States v. Saucedo, 950 F.2d 1508, 1513 (10th Cir. 1991); see USSG Ch.3, Pt.B, intro. comment.; USSG §1B1.3(a).

Once again, the uncontested facts support the district court's finding that the criminal activity in which Dettloff took part was "otherwise extensive." The scheme involved those who obtained legitimate checks for copying, those who lent the organization their checks, those who printed counterfeit checks (which Dettloff admits was someone other than himself), and those who recruited facemen. The scheme operated in at least four states. The individual trips themselves involved unwitting employees at the various state motor vehicle departments and at the financial institutions. The Denver trip alone involved cashing checks at eleven different banks. The evidence also supports the existence of unnamed and unknown "higher-ups," who telephoned instructions to Dettloff in Denver, arranged for and purchased his airplane tickets, and received a percentage of the proceeds.

We conclude that the district court did not clearly err in giving Dettloff a three-level adjustment for his aggravating role in the offense.  Accordingly, we AFFIRM.  The mandate shall issue forthwith.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge